LARIO, J.T.C.
Coastal Eagle Point Oil Company [Coastal], an operating oil refinery, has filed direct appeals to this court seeking a reduction of assessments levied by West Deptford Township and Westville Borough upon its property known as Eagle Point Refinery for the tax years 1985,1986 and 1987. West Deptford filed counterclaims for the tax year 1987.
The refinery complex, which aggregated 1350.67 acres for 1985 and 1001.206 acres for 1986 and 1987, is bounded by Route 130, Crown Point Road and the Delaware River. It is bisected by the municipal boundary line between the two defendant municipalities. The parcels assessed in West Deptford are listed as Block 161, Lot 1; Pipeline, Lot 1.01; and Block 1, Lot 1. The parcels assessed in Westville are designated as Block 71, Lot 22; Block 40, Lot 1; and Block 46, Lot 1. The parties have stipulated that the entire property under appeal is to be valued as a single economic unit; and in the event a reduced assessment is warranted, the parties have agreed to make the proper allocation among themselves.
The assessments for the three years in question are as follows:
1985
WEST DEPTFORD
Block Lot Land Improvements Total Taxable Exemption Assessment
161 1 845,500 237,800 1,083,300 -0-1,083,300
Pipeline 1.01 -0- 128,500 128,500 -0-128,500
1 1 26,014,000 62,834,000 88,848,000 8,945,900 79,902,100
Total 26,859,500 63,200,300 90,059,800 8,945,900 81,113,900
Chapter 123 Katio: 91.75%
*252 1985
WESTVILLE
Block Lot Land Improvements Total
71 22 440,700 730.300 1,171,000
40 1 89,200 -0- 89,200
46 1 1,000 -0- 1,000
Total 530,900 730.300 1,261,200
Chapter 123 Ratio: 69.13%
1985 TOTAL ASSESSMENT—WEST, DEPTFORD and WESTVILLE
Land: 27,390,400
Improvements: 63,930,600
Total: 91,321,000
Exemption 8,945,900
Net Total: 82,375,100
1986
WEST DEPTFORD
Block Lot Land Improvements Total Exemption Taxable Assessment
161 845,500 237,800 1,083,300 -0-1,083,300
Pipeline 1.01 -0-128,500 128,500 -0-128,500
1 1 8,945,900 19,106,100 62,443,200 81,549,300 72,603,400
Total 19,951,600 62,809,500 82,761,100 8,945,900 73,815,200
Chapter 123 Ratio:
*253 1986
WESTVILLE
Block Lot Land Improvements Total
71 22 334,700 730.300 1,065,000
40 1 89,200 -0-89,200
46 1 1,000 -0-1,000
Total 424,900 730.300 1,155,200
Chapter 123 Ratio: 64.68%
1986 TOTAL ASSESSMENT—WEST DEPTFORD and WESTVILLE
Land: 20,376,500
Improvements: 63,539,800
Total: 83,916,300
Exemption 8,945,900
Net Total: 74,970,400
1987
WEST DEPTFORD
Improvements Total Block Lot Land Exemption Taxable Assessment
161 1 845,500 ' 237,800 1,083,300 -0-1,083,300
Pipeline 1.01 -0-128,500 128,500 -0-128,500
1 1 19,106,100 62,443,200 81,549,300 8.945.900 72,603,400
Total 19,951,600 62,809,500 82,761,100 8.945.900 73,815,200
Chapter 123 Ratio: 90.08%
*254 1987
WESTVILLE
Block Lot Land Improvements Total
71 22 570,000 1,058,800 1,628,800
40 1 85,500 -0- 85,500
46 1 2,000 -0- 2,000
Total 657,500 1,058,800 1,716,300
Chapter 123 Ratio: Revaluation 100%
1987 TOTAL ASSESSMENT—WEST DEPTFORD and WESTVILLE
Land: 20,608,100
Improvements: 63,868,300
Total: 84,476,400
Exemption 8,945,900
Net Total: 75,530,500
As of the initial assessing date, October 1, 1984, Eagle Point Refinery was owned by Texaco Oil Company [Texaco] which sold it to Coastal on May 20, 1985. The cash selling price was 42.5 million dollars. The sale was transacted under and pursuant to a consent order issued July 10,1984 by the Federal Trade Commission (FTC) as a result of Texaco’s proposed acquisition of the Getty Oil Company. Texaco was ordered, in addition to other requirements, to divest itself of the Eagle Point Refinery within 12 months from July 10, 1984.
Plaintiffs expert utilized the market approach and the cost approach in estimating his values for all years. He also considered the income approach but ultimately disregarded it as unreliable. His final value was based upon his conclusion that the greatest weight be given to the market approach and that the *255 Texaco to Coastal sale [T-C sale] of the subject property was the best indicator of its value. He then adjusted his sale price downward by 4 million dollars representing the alleged value to Coastal for a processing agreement simultaneously entered into between the parties, and by 3.6 million dollars for ECRA clean-up costs. The net adjusted sale price was 34.9 million dollars. His final value for the 1985 tax year was rounded to 35 million dollars. For the tax year 1986, he concluded a value of 33 million dollars, and for the tax year 1987, a value of 43 million dollars.
Defendants contend, primarily, that since the parties stipulated that the refinery itself and its integrated facilities, exclusive of the out-buildings and other nonprocessing equipment, constituted special purpose property which cannot be converted to an alternative use, the only proper appraisal approach is the replacement cost less depreciation methodology. See, e.g., Transcontinental Gas Pipe Line Corp. v. Bernards Tp., 111 N.J. 507, 518, 545 A.2d 746 (1988); Anaconda Co. v. Perth Amboy, 157 N.J.Super. 42, 46, 384 A.2d 531 (App.Div.1978), vacated in part, 81 N.J. 55, 404 A.2d 1155 (1979); Royal Mfg. Co. v. Board of Equal, of Taxes, 76 N.J.L. 402, 70 A. 978 (Sup.Ct.1908), aff'd 78 N.J.L. 337, 74 A. 525 (E. & A.1909). Defendants contend that under the cost approach, the subject’s true value is $107,851,340 for the tax year 1985; $104,-476,611 for 1986; and, $124,051,695 for 1987.
Alternatively, defendants urge that the T-C sale is not a useable sale. First, the sale was the result of an FTC order and thus not an arms-length transaction. Second, the petroleum processing agreement simultaneously executed with the sale allegedly had the effect of diffusing the purchase price as the true consideration. Third, if the sale is accepted, there should be added to it (instead of deducted as claimed by plaintiff) the value to Texaco of the processing agreement. Additionally, defendants add that for the tax year 1987 the property’s true value would be $94,232,000 under the market approach or $114,800,000 under the income approach. Defendants did not produce any affirmative proofs of value by way of the market or income approaches for the tax years 1985 and 1986.
*256 After plaintiffs case in chief and during the direct testimony of one of defendants’ experts, the parties entered into a stipulation on the record that the refinery itself (exclusive of out-buildings and other parts of the facility) is a special purpose property that cannot be converted to an alternative use. As heretofore noted by reason of this stipulation, defendants contend the only valuation methodology applicable that this court can consider is the cost approach. Before analyzing the appraisals submitted by the opposing experts, this court must first address this legal contention.
N.J.S.A 54:4-23 directs that the assessor shall “determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract____” In interpreting this statute, our courts have stated on numerous occasions that there is no single methodology for the valuation of real property for purpose of local tax assessments. Over 40 years ago our Supreme Court declared:
The statutory standard for assessment is “full and fair value” of the property “at such price as” in the judgment of the assessor “it would sell for at a fair and bona fide sale by private contract.” [N.J.S.A 54:4-23] The statute neither requires nor excludes any specific formula for measuring fair value.
[Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 175, 87 A.2d 425 (1952)]
It reaffirmed this conclusion several years later stating:
The search, of course, is for the fair value of the property, the price a willing buyer would pay a willing seller. Consideration may be given to cost less depreciation and sale of comparable property. It may also be given to rental income. Aetna Life Insurance Co. v. City of Newark, 10 N.J. 99, 106 [89 A.2d 385] (1952); Appeal of Pennsylvania Railroad Co., 20 N.J. 398, 412 [120 A.2d 94] (1956); Annot., 95 A.L.R. 442 (1935). There can be no rigid rule. The answer depends upon the particular facts and the reaction to them of experts steeped in the history and hopes of the area.
[New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 543-44,189 A.2d 702 (1963)]
And, thereafter, as stated by our Appellate Division:
There is no single doctrinaire approach to the methodology of the valuation of real property or any phase thereof. An expert may properly bring all his knowledge and experience to bear on the critical issue of the price for which, in his judgment, the subject property will sell between parties willing but not compelled to sell or buy, as the case may be.
*257 [Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 72, 208 A.2d 153 (App.Div.1965).]
And later, as reiterated by our Supreme Court:
It is recognized that there is no single rule or approach that must be followed in valuing real property. Glen Wall Associates v. Wall Tp., 99 N.J. 265 [491 A.2d 1247] (1985); Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 72 [208 A.2d 153] (App.Div.1965). The statute does not require or exclude any particular method of assessing true value. Riverview Gardens, supra, 9 N.J. at 175 [87 A.2d 425], “The answer [to the valuation of property] depends upon the particular facts and the reaction to them of experts steeped in the history and hopes of the area.” New Brunswick v. Tax Appeals Div., 39 N.J. 537, 544 [189 A.2d 702] (1963).
[Pantasote Co. v. Passaic, 100 N.J. 408, 414, 495 A.2d 1308 (1985).]
And as appraisers are admonished:
In assignments to estimate market value, the ultimate goal of the valuation process is a well-supported value conclusion that reflects all the factors that influence the market value of the property being appraised. To achieve this goal, an appraiser studies a property from these different viewpoints, which correspond to the three traditional approaches to value____the cost approach ... the sales comparison approach ... the income capitalization approach.
The three approaches are interrelated; each requires the gathering and analysis of cost, sales, and income data that pertain to the property being appraised.
[Appraisal Institute, The Appraisal of Real Estate 71 (10th ed. 1992)].
The facts existing in the cases cited by defendants in support of their allegation that the cost approach is the sole method to be utilized are completely different from those existing here. In the cited cases, there were no facts to support a true value finding by any method other than the cost approach. There is a distinction between truly special-use property (also called special-purpose) and limited-market property. The term “special-use” excludes property for which there is a market. However, “limited-market property is not necessarily special-use property. If a reasonably active, albeit limited, market is shown to exist, the property is not appropriately characterized as special-use or purpose. See Albritton, Valuation of Special-use Property Types, XLVIII The Appraisal Journal 367 (July 1980).” Shulton, Inc. v. Clifton, 7 N.J.Tax 208, 217 (Tax 1983), aff'd 7 N.J.Tax 220 (App.Div.1984). This distinction was pointedly observed by Judge Andrew in Sunshine Biscuits, Inc. v. Sayreville, 4 N.J.Tax 486 (Tax 1982) wherein he stated:
The line of cases which defendant has advanced in support of its proposition that the cost approach is the only acceptable procedure involve improvements which are *258 either particularly unique in character, incapable of economic conversion to other uses, or for which there was inadequate data relating to market transactions of similar properties. ■ The courts, therefore, resorted to the cost approach in the absence of any other meaningful procedure.
[at 496-97, citations omitted; emphasis added]
And, again as iterated by Judge Crabtree in Glenpointe Assocs. v. Teaneck Tp., 10 N.J.Tax 380 (Tax 1989), aff'd 12 N.J.Tax 118 (App.Div.1990) wherein he addressed and disposed of the exact issue which defendants present here:
The first issue to be addressed is defendant’s contention that the best evidence of the subject’s true value for tax assessment purposes is the actual cost of construction. Defendant argues that the hotel is a special purpose property, which can be properly valued only by the cost approach, citing Anaconda Co. v. Perth Amboy, 157 N.J.Super. 42, 384 A.2d 531 (App.Div.1978), vacated and remanded on other grounds 81 N.J. 55, 404 A.2d 1155 (1979); Pantasote Co. v. Passaic, 6 N.J.Tax 34 (Tax Ct.1983), aff'd 100 N.J. 408, 495 A.2d 1308 (1985) and Transcontinental Gas Pipe Line Corporation v. Bernards Tp., 111 N.J. 507, 545 A.2d 746. Defendant’s argument must fail for four reasons.
First, the search is for the fair value of the subject property; and in that connection consideration should be given to all three approaches to value, even if one assumes the property to be special purpose in character. There is no doctrinaire approach to value.
[ 10 N.J.Tax at 388-89; citations omitted]
In the instant case, appraisers for both parties, who are acknowledged experts for the valuation of refineries, have testified to numerous sales of refineries which were alleged to be comparable. It is clear from the evidence submitted herein that a market exists, though limited, for the sale of refineries. Therefore, this court will consider and weigh all methods of valuation advanced by the respective experts herein.
Plaintiff presented as its valuation expert, Stephen M. Kline, Vice President of. Arthur D. Little Valuation, Inc., an organization specializing in the valuation of complex properties. In preparation of his appraisal report, Kline, over a period of weeks, extensively inspected the subject property and its processing units. The Eagle Point Refinery was initially constructed by Texaco in the late 1940’s, after which various additions and deletions to the processing units have occurred resulting in the *259 current configuration. The accuracy of the description and photos of the refinery’s improvements as contained in Kline’s appraisal report was, apart from a few minor exceptions, stipulated by the parties.
Although defendants stipulated to Kline’s description, they contest Kline’s designation of the refinery’s production capacity. The major “unit of measurement” accepted as standard for the oil and gas industry is the “number of barrels per-stream day” (BPSD) that a refinery can process. Kline designated the Eagle Point Refinery as being designed to process 95,000 BPSD of crude oil, “primarily light and sweet in nature.” Since BPSD rating denotes the “flat out rate,” an alternative measure sometimes employed is the “barrels per calendar day” (BPCD). The BPCD concept allows for down time for repairs, maintenance and turn around. Kline projected an operating rate for Eagle Point of 90.000 BPCD. Defendants allege that the source of Kline’s information was not Coastal but rather an article in The Oil and Gas Journal. Defendants contend that a descriptive brochure, prepared and distributed by Texaco in connection with its efforts to market the refinery to prospective customers, shows a capacity of 105.000 BPSD and that this latter production capacity is correct.
Experts for both parties agreed that The Oil and Gas Journal, which regularly publishes refinery statistics, is the authoritative technical source publication for the oil and gas industry and that data and factual statements published therein are reliable. Kline testified that the Journal annually publishes the unit sizes for all refineries in the United States and it was from there he extracted that the subject is rated as 95,000 BPSD. One of defendants’ expert witnesses, Richard F. Kilgore, noted that as reported by the United States Department of Energy for January 1, 1985 the subject’s crude capacity was 90,000 barrels per calendar day. The alleged discrepancy between the Journal’s rating and the brochure’s claim was clarified by Texaco’s Senior Vice President who acknowledged that “although on the meanest crude, it could on a given day run more than 95,000 barrels a day, they’d struggle pretty hard to do it ... in fact, I think we had had periods when it *260 ran over 100,000 ... but on average, on calendar day basis, 95,000 is the number.”
In view of the above evidence and the acceptance by the experts of the Journal’s published BPSD ratings for all the refineries used by them as comparables, I find that the correct production capacities for the Eagle Point Refinery to be used in the various valuation methodologies utilized herein are 95,000 BPSD and 90,000 BPCD.
Various types of crude oil are processed at Eagle Point, but Minas and Daquing are predominant. The terms “Minas” and “Daquing” refer to names of crude oils which are produced in different areas of the world, to wit: Indonesia and China respectively. The physical properties of Minas and Daquing are such that the crude oil must be heated while in storage to maintain viscosity. This is a more costly storage method than is used for most other crudes.
Crude oil is received at the Eagle Point Refinery by barge and tanker through the docks located on the Delaware River. No crude can be received by pipeline—an unusual situation when compared to most refineries outside the Northeast. As explained by Kline:
The Eagle Point Refinery is considered a moderately complex refinery, a designation which characterizes its ability to convert a barrel of crude oil to product. This type of refinery is different from a simple topping unit which processes crude through an atmospheric distillation column only. The simple topping unit produces relatively low volumes of high value product and high volumes of lower value and heavy middle distillates and residual products.
The refinery product slate includes leaded and unleaded gasoline, distillate fuels, furnace oils, jet fuel, LPG, and cumene. The various products are supplied and distributed by pipeline from the refinery or through the tanker truck loading facilities adjacent to the refinery.
The Eagle Point Refinery, as do all refineries, consists of (1) land, (2) process units, (3) “off-site” units which embrace such things as storage tanks, power plants and waste-water treatment plants, and (4) administrative and other non-refining buddings and site improvements.
*261 LAND.
As of October 1, 1984, the subject’s land measured 1,350.67 acres. As of October 1, 1985 and October 1, 1986, the refinery’s area was reduced to 1,001.206.
PROCESS UNITS.
Process units perform the main function of refining crude oil distillation, fractionalization, cracking, conversion, and treating to produce the finished product. As described by one of the witnesses, “the process units constitute the heart and brains of a refinery.” These typically include the major equipment components (such as pumps, compressors, vessels, towers, heaters, reactors, and heat exchangers) as well as the associated concrete foundations, structural steel supports, piping, valves, instrumentation, painting, insulation, and electrical wiring. Eagle Point Refinery is composed of the following process units:
Crude Unit This unit consists of the atmospheric section (95,000 BPSD) and the vacuum section (31,000 BPSD). Construction was completed in 1949 with a gas oil tower section being added in 1956. Over the years, various modifications have occurred to enhance performance and expand the unit’s original capacity of 42,000 BPSD.
Visbreaker This unit, a thermal cracking unit (13,000 BPSD), was constructed in 1956; it has been out of service since 1978 as its process is no longer required for Minas or Daquing crudes. The unit requires extensive repair work to make it operable.
Fluid Catalytic Cracker This unit (40,000 BPSD), which is the main unit that converts steam coming out of the atmospheric section to gasoline, was completed in 1949. Various modifications and additions have been made on this unit over the years to improve its performance and to enhance its energy conservation.
Catalytic Reformers Two catalytic reformers identified as CRU No. 1 and CRU No. 2 (38,000 BPSD) were constructed in 1954 and 1968 respectively. CRU NO. 1 has been shut down since 1982 when Texaco’s benzine and toluene operation was discontinued.
*262 Catalytic Hydrotreating These items consisting of four units, HTU-1, 2, 3 and 4 (973,000 BPSD), were constructed from 1954 to 1974 by various contractors. Only one, HTU-4, which is integral with CRU-2, is still in use.
Alkylation Construction of this unit was completed in 1955. With modifications made in 1964, this unit’s capacity was increased to 3,000 BPD.
Polymerization This unit (2,500 BPD) was built in 1949, and various modifications have occurred over the years. One of the 12 reactors is not operational.
Sulfur Plant This unit was constructed in 1950. Its original design capacity was 40 long tons a day (LT/D); however, because of sweet crudes being run, the plant operates at less than 5 LT/D.
Eagle Point additionally produces some chemicals that are produced by the Cumene Unit (2,200 BPD-Production). This unit, described as a small chemical operation and not significant, was constructed in 1960. It is not a licensed process.
Units, which were constructed between 1949 and the present, that are no longer required for refinery operation and have been shut down include: sulfolane, clay treating and fractionation, Linde unit, Furfural (no longer on site), HTU-1, 2, and 3, CRU-1, Visbreaker and DealTex.
REFINERY OFFSITES.
The term “offsites” as used herein denotes the facilities which typically provide general support functions to the process units. (However, it should not be interpreted as referring to assets physically off the refinery site.) These facilities are primarily located outside the process unit battery limits and include the pumps, boilers, piping, instrumentation, and foundations associated with these support services. The refinery offsites include: power generation, fire protection lines and facilities, steam facilities, blowdown and flare system, air facilities, electrical distribution, water treating facilities, communications and control, cooling towers, tankage, and cooling water piping, oil movement and blending, hard process lines, steam and condensate piping, receiv *263 ing and shipping lines, water wells, clean and oily effluent disposal, blending facilities, raw water supply piping, main interconnecting piping, products loading, utility and potable water, tank ear loading facilities, air piping, fuel systems piping and other facilities and substations.
BUILDINGS and SITE IMPROVEMENTS.
Buildings refer to approximately 80 buildings on the refinery site which range from large, well-constructed structures (such as the administration building) to small, metal-clad structures which have been partially dismantled and left in a dilapidated condition.
Site improvements as used herein include plant roads and access roads which generally consist of sub-base and asphalt-topping and secondary-gravel roads; the refinery drainage system consisting of open ditches, culverts beneath roads, and storm water retention basins; barge and tanker docking facilities located on the Delaware River; rail facilities consisting of track, switches and bumpers; and fencing and landscaping.
As previously stated, Kline considered all three traditional approaches to value, but he discarded the income capitalization approach and utilized the cost and market approaches. The defendants relied mainly upon the cost approach for all three years and added income and market values for 1987.
COST APPROACH.
The accepted description for this approach is:
The cost approach is based on the understanding that market participants relate value to cost. In the cost approach the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (i.e., deterioration and obsolescence) in the structures from all causes.
[The Appraisal of Real Estate, supra at 80.]
LAND.
The parties entered into a written stipulation regarding the size and per acre valuation of the land as follows:
*264 1985 TAX YEAR
TOWN BLOCK LOT ACRES PER ACRE VALUE MARKET VALUE
WESTVILLE 71 22 29.48 11.150 $ 328,702
WESTVILLE 40 1 2.835 11.150 31,610
WESTVILLE 46 1 0.075 11.150 836
WEST DEPTFORD 161 1 43.28 11.150 482,572
WEST DEPTFORD 1 1, 7, 8 & 9 1,272.00 [1] 11.150 14,216,250
TOTAL ACRES: 1,350.67
TOTAL: $15,059,970
1986 TAX YEAR
TOWN BLOCK LOT ACRES PER ACRE VALUE MARKET VALUE
WESTVILLE 71 22 19.016 [2] 11.919 $ 226,652
WESTVILLE 40 1 2.835 11.919 33,790
WESTVILLE 46 1 0.075 11.919 894
WEST DEPTFORD 161 1 43.28 11.919 515,854
WEST DEPTFORD 1 1 936.00 11.919 11,156,184
TOTAL ACRES: 1,001.206
TOTAL: $11,933,374
*265 1987 TAX YEAR
TOWN BLOCK LOT ACRES PER ACRE VALUE MARKET VALUE
WESTVILLE 71 22 19.016 11.356 $ 215,945
WESTVILLE 40 1 2.835 11.356 32,194
WESTVILLE 46 1 0.075 11.356 852
WEST DEPTFORD 161 1 43.28 11.356 491,488
WEST DEPTFORD 1 1 936.00 11.356 10,629,216
TOTAL ACRES: 1,001.206
TOTAL: $11,369,695
IMPROVEMENT COSTS and DEPRECIATION.
Defendants further agreed and stipulated that the correct cost new figures to be utilized in this case are the reproduction cost figures as set forth in Kline’s appraisal report which are as follows:
October 1, 1984 $398,147,000
October 1, 1985 $410,056,000
October 1, 1986 $423,418,000
The above figures represent the reproduction costs new of improvements only, exclusive of the land values hereinabove set forth, and prior to any allowance or deduction for physical depreciation, functional or economic obsolescence. The parties were left to their proofs with regard to this depreciation factor except to off-site improvements and non-refining buildings and other non-process real estate.
As to the off-site improvements, Richard Daniels, defendants’ valuation expert for the years 1985 and 1986, agreed with the physical depreciation determined by Kline but he made no allowance for either functional or economic obsolescence for these off-site buildings.
As to certain buildings and other non-process real estate, they stipulated the physical and functional depreciation attributable *266 thereto for the tax years 1985 and 1986, however, they specifically did not resolve the issue of the economic obsolescence applicable thereto, leaving the parties to their proofs.
Thus, relative to the cost approach proposed by each party, the only determinations remaining unresolved are the proper amounts of depreciation allowable for those improvements not agreed upon as delineated above. Although in the average case this difference would be minor, in the instant case the experts for both parties differ enormously, being over 66 million dollars apart for the first two years and over 81 million dollars for the third year.
In assessing his calculation of the lost utility to the improvements, Kline first assigned estimated useful lives to the improvements based upon research and discussions held with plant personnel and manufacturers. In support thereof, he introduced a study prepared by Dr. Wilbur Nelson, Editor of The Oil and Gas Journal, and “the noted industry expert” which concludes that the average age for a typical U.S. refinery is approximately 17 years; however, Kline explained: “This fact is not to be taken literally; it is rather, an indication of the fact that as time progresses, additional units are added to a refinery and others retired. During a 20-year period the capital investments of a typical refinery •will likely double.”
Based thereon, Kline determined an economic life of 25 years to the process units and 40 years to the non-processing components. He then determined an effective age for each property predicated upon its actual age and maintenancé schedule, including allowance for erosion. The foregoing data was then plotted through the use of his non-linear analysis whereby he developed an average age of 27 years for both the process units and off-sites with a remaining life of three to five years for the process units and 13 years for the off-sites.
Kline further testified that functional or technical obsolescence is a fundamental factor in the refining industry and a study of the past 100 years of the refining process advancements indicates that major technological changes occur on an average of once every 12.5 years; and indicative of this constant change occurring in the *267 industry is the continual capital investment. He stated that the Eagle Point facility has experienced continual capital additions and deletions during the period from 1949 through 1985 as a result of which the current facility is markedly different from its original conception.
Kline then detailed numerous areas of functional obsolescence suffered by the process units of the subject property. The refinery had many assets that were obsolete and not state of the art. The plant was incapable of effectively competing in the market place because of the high cost of its operations and products. The plant was unable to process sour crude oil. It was capable of processing only sweet crude oil, which had a significant $1.50 to $2.50 a barrel higher feed stock cost over sour crude oil. The plant had expensive, out of date heat recovery methods, having been built when cost of energy was very small and fuel efficiency was not maximized. Additionally, the plant was scattered over roughly several hundred acres, requiring operation out of numerous control rooms which made it extremely expensive to operate from a personnel standpoint.
Kline made further economic obsolescence deductions to devalue the subject property. He presented an overview of the oil economy covering the period from 1981 to 1985 and concluded that refinery utilization rates (that percentage of capacity at which refineries operate) were in decline. Foremost among those reasons was the increased efficiency of the automobile. During this period of time, numerous refineries throughout the United States were being shut down and others were not fully utilized. Additional obsolescence was attributed to the influx of refined product from Middle East refineries that were among the most efficient in the world and held a captive crude oil market. He determined an appropriate deduction for economic obsolescence to be approximately 70% of the net cost figure. Summaries of Kline’s cost-depreciation approach for the tax years 1985,1986 and 1987 are as follows:
*268 1985
Cost New (stipulated) Depreciated Cost
Process units 289,497,000 12,867,186
Offsites—Tanks 48,151,000 —Other 43,667,000 8,702,960 3,363,241
Buildings & Site Imp. 16,832,000 1,753,311
Land (Stipulated) 15,059,970
Total 398,147,000 41,746,668
1986
Cost New (stipulated) Depreciated Cost
Process units 298,182,000 12,525,783
Offsites—Tanks 49,640,000 —Other 44,977,000 8,323,280 3,464,138
Buddings & Site Imp. 17,257,000 1,639,871
Land (Stipulated) 11,933,374
Total 410,056,000 37,886,446
1987
Cost New (stipulated) Depreciated Cost
Process units 307,127,000 16,203,465
Offsites—Tanks 52,358,000 —Other 46,326,000 8,623,200 4,379,171
Buddings & Site Imp. 17,607,000 2,112,690
Land (Stipulated) 11,369,695
Total 423,418,000 42,688,221
Richard Daniel, a professional engineer, experienced in cost estimating of refinery process units, testified on behalf of the *269 taxing districts as to the value of the refinery for the tax years 1985 and 1986. As previously stated, he valued the refinery solely by way of the cost approach. Although Daniel filed an appraisal report which itemized the replacement cost new and net values of the process units, utilities, tanks and yard piping for the years 1985 and 1986, in view of defendants’ stipulation accepting the accuracy of Kline’s description and reproduction cost new figures for those units, which was entered into during the midst of trial, Daniel’s testimony was limited to the issue of depreciation.
Daniel utilized a 35 year useful life for the process equipment and applied a straight-line method of depreciation to arrive at his respective physical depreciation percentages. He set a floor on that age-life method at 70% except for two minor items that had been completely shut down and “cannibalized” for its parts, which he depreciated 90%. Using these age bases, he determined a physical depreciation percentage for each of the units which he deducted from his replacement costs to arrive at his net value.
In his original report, having used replacements costs, he did not make any deduction for functional obsolescence. As a result of the stipulated use or reproduction cost figures, he recomputed his figures to include functional obsolescence. He calculated his functional obsolescence percentage by dividing Kline’s stipulated reproduction cost into his estimated replacement cost as originally utilized by him in his appraisal report to arrive at functional depreciation. He subtracted this result from the reproduction cost and then calculated his physical depreciation which he also deducted. Thereafter he made a separate allowance of 5% for additional functional obsolescence resulting from the existence of the multiple “seven or eight” control rooms, which he deemed less than an ideal layout for the overall facility.
By this method, Daniel’s total depreciated value for the process units came to $48,616,000 as compared to Kline’s $12,867,186 for the tax year 1985. For the tax year 1986 his total depreciated value for the process units came to $47,976,000 as compared to Kline’s $12,525,783.
*270 As to the off-sites tanks, he allowed no functional obsolescence granting solely physical depreciation of 59.2% to arrive at a depreciated value of $19,646,000 compared to Kline’s $8,702,960 for 1985. For 1986, he increased his physical depreciation to 60%, arriving at a depreciated value of $19,856,000 compared to Kline’s $8,323,280.
For other off-sites improvements, he accepted Kline’s physical depreciation but granted no other obsolescence, thereby arriving at a value of $18,685,000 compared to Kline’s $3,363,241 for 1985; and, for the tax year 1986, $19,245,000 compared to Kline’s $3,464,138.
Daniel’s appraisal did not include valuations for the buildings and site-improvements nor was any affirmative proof relative to their value introduced. Instead, defendants accepted Kline’s cost new figures for both years and also his allocation for physical and functional obsolescence, but found no economic obsolescence. Defendants then eliminated Kline’s 70% economic obsolescence by dividing Kline’s final depreciated value of $1,753,311 by 30% to produce $5,844,370 which defendants accepted as their depreciated value before economic obsolescence for 1985. Defendants repeated this formula for 1986 to arrive at their net depreciated value of $5,466,237. Kline’s depreciated costs for 1986 was $1,639,871.
Daniel’s total depreciated value for the refinery portion of the improvements plus defendants’ calculations for the buildings and site-improvements totaled $92,791,370 for the tax year 1985 and $92,543,237 for 1986. Kline’s totals were $26,686,698 and $25,953,-072 respectively. Adding to defendants’ improvement costs the stipulated land values results in a total cost approach value of $107,851,340 for 1985 and $104,476,611 for 1986 as compared to Kline’s $41,746,668 and $37,886,446 respectively.
Robert Paschall, a Consulting Valuation Geologist and Engineer, was called by defendants as a rebuttal witness to Kline’s *271 market approach for the tax years 1985 and 1986[3] and as an affirmative valuation expert for the tax year 1987. Paschall had 20 years of experience in the California oil industry and was employed for 16 years as Senior Petroleum Appraisal Engineer for the California Board of Equalization.
He reported that six Los Angeles refineries similar to Eagle Point had an average effective age of 13.1 years and one other refinery had an effective age of 12.5 years. He estimated that the effective age of Eagle Point was 14 years as of October 1, 1984 and 15 years as of October 1, 1985 with an overall estimated economic life of 22 years. As of October 1, 1986, he assumed its effective age to be 14 years with an economic life of 22 years.
He testified that as a result of his extensive work in this field over the last 15 years, he had composed his own depreciation factors to apply to the replacement cost new of industrial machinery and equipment. He then referred to a chart (labeled “Figure 4” in his appraisal report) containing four curves which he explained as follows: “Figure U shows four depreciation curves: One used by California county assessors, one used by Contra Costa County in computing reproduction cost less depreciation (RCLD) for its five oil refineries, one, the standard unmodified age/life curve, and one composed by the writer.”
Paschall then employed the curve he composed to appraise the RCLD value of Eagle Point for the tax year 1987. He said by using his composed depreciation curve for an age of 14 years and an economic life of 22 years, it resulted in an overall depreciation factor of .356, “which put conversely, states that some functional depreciation has occurred to the extent of 100 minus 35.6%, or 64.4%.” Applying this .356 depreciation factor to the improvements’ stipulated replacement cost new of $423,419,000 resulted in an “unadjusted” value of $150,737,000.
*272 Paschall then indexed upward to October 1, 1986, the storage tanks’ stipulated 1985 reproduction cost new value to arrive at a value of $50,136,000[4]. He concluded that about 23 days’ worth, or, 26% based upon an existing 89 days’ storage capacity of Eagle Point’s storage tanks are excess and obsolete. He then multiplied $50,136,000 times .26 times .356 to arrive at $4,641,000. He then deducted this storage tank depreciation from his previous unadjusted value of $150,737,000 to arrive at a depreciated value of $146,096,000.
He next estimated an additional 20% depreciation for the buildings based upon an assumed age of about 40 years. Applying 20% to the buildings’ stipulated 1987 reproduction cost new of $12,069,-000 resulted in an adjustment of $2,414,000 depreciation for the buildings. Although he stated, “The buildings are still serviceable, but it is doubtful that they would be replaced with identical units,” he did not factor in any functional obsolescence. He then reported:
The computers at Eagle Point have not been centralized. Instead, each major process unit has its own control room. This is a substantial form of F.O., because of the excess personnel required to operate all the seven or eight control rooms. The 1986 RCN of the process units alone is $307,127,000. It is estimated that the “cost to cure” by centralization of controls would be 10% of that figure, or about $31,000,000. the adjusted RCLD at this point is therefore $143,682,000—$31,000,-000 = $112,682,000.
Paschall granted no depreciation for economic obsolescence based upon the following as set forth in his report:
In the absence of a long history of operations, if one engages only in the cost approach to value. E.O. can be estimated by comparing the refinery’s utilization rate (RUR) with its optimum RUR. This optimum RUR is the longterm rate at which a refinery may be expected to operate, divided by its stream-day capacity.
Eagle Point’s optimum RUR is deemed to be the 90,000 B/D rate used in Chapter IV, Application of the Income Method, divided by its stream-day capacity of 105,000 B/D, yielding an RUR of 85.7 percent.
90,000 B/D equates with 32,850,000 barrels per year. In 1986, actual known input of crude oil was 33,374,000 barrels. Recent input, relative to the date of appraisal, has therefore exceeded the optimum rate of input.
Also, work done by both Texaco and Coastal appear to obviate the necessity for near-term investment in additional mandated pollution-control facilities.
*273 It is therefore not necessary to make an adjustment for E.O.
He then concluded that the estimate of the reproduction cost, less depreciation of all improvements of Eagle Point as of October 1,1986 is $112,682,000. Adding to this the stipulated land cost of $11,369,695[5] results in a total cost approach value of $124,051,695.
INCOME APPROACH.
The only income approach to value directly offered in evidence for any of the years under appeal was the report and testimony of Paschall on behalf of the taxing districts. As previously noted, although Kline originally had included an income approach in his pretrial report, at trial, he deleted it stating that the cost data utilized which formed the basis of his proposed income opinion was incorrect thereby making it unreliable. He therefore abandoned the income approach for all three years.
Paschall, in the application of his income method, first set out to ascertain the Net Operating Income (N.O.I.) of Eagle Point for the three years under appeal. He described N.O.I. as being “at the pre-tax, pre-debt-interest, pre-depreciation level and ad valorem property taxes are also included in N.O.I., and are compensated for in the total discount rate.” His first step was to estimate future N.O.I. [as defined by him]. He did so by computing that level of income at Eagle Point for 1985, 1986 and 1987 derived by him from Coastal’s Financial Statements [forms 10-K filed annually with the S.E.C.] plus the addition of ad valorem taxes listed on Coastal’s summaries which he concluded yield these N.O.I.s: 1985—$14,626,000 for eight months; 1986, $2,737,000; and, 1987, $14,654,000. He then determined the adjusted N.O.I. for each year by employing the following calculations:
1985—Coastal’s report shows eight months’ operations in 1985, so thus ran Eagle Point for % of the year. Coastal’s indicated N.O.I. for a full year is therefore $14,626,000 time % or $21,939,000.
Texaco’s crude oil runs in the last eight months of 1985 were 11,718,000 barrels, versus Coastal’s 7,986,000. Texaco’s imputed N.O.I. in 1985 is therefore the first *274 figure divided by the second, whose quotient is 1.4673, times $21,939,000, or $32,191,000.
The sum of the two N.O.I.’s, which is the indicated total refinery N.O.I. in 1985, is $54,130,000. But estimated full-year crude oil runs were 29,556,000 barrels, or 80,975 B/D. This N.O.I. must be adjusted to the level of 90,000 B/D, or 32,850,000 barrels per year, for the purpose of projection. That is (90,000 divided by 80,975), times $54,130,000, or $60,162,000.
1986— Coastal’s pre-tax loss of $4,188 must be adjusted for Texaco’s loss, in order to derive total refinery N.O.I. Texaco’s crude runs in 1986 were 18,250,000 barrels, versus Coastal’s 15,124,000 barrels, for a total of 33,374,000 barrels, Texaco’s crude runs divided by Coastal’s yield is a quotient of 1.2067. This quotient, multiplied by Coastal’s net income, yields Texaco’s loss of $5,054,000.
The sum of the two is a loss of $9,242,000. This figure must be further adjusted to 32,850,000 barrels per year. That adjustment is 1.016 times $9,242,000, or [a loss of! (9,390,000).
1987— Texaco’s Ñ.O.I. in 1987 is computed by multiplying Coastal’s N.O.I. of $14,654,000 by Texaco’s crude runs of 15,049,000 barrels divided by Coastal’s crude runs of 14,921,000 barrels. The quotient is 1.008, so Texaco’s indicated N.O.I. is $14,771,000. Total refinery N.O.I. was thus $29,425,000.
Adjustment from the year’s total crude runs of 29,969,000 barrels to 32,850,000 yields 1.096 times $29,425,000, or $32,254,000.
Paschall then stated that the average N.O.I. for the three years was $27,675,000; after which he concluded that the future N.O.I. will average 25 million dollars a year [why he reduced this average by $2,675,000 was not explained].
He then arrived at a 19% discount rate which he computed as follows:
[By] my own extensive observations [there exists] a spread of six to nine percentage points, depending on relative risk, between the interest rate on long-term corporate bonds and the total discount rate. That interest rate for companies or syndicates that might buy Eagle Point, was about 11% in late 1986. I judge that Coastal Corporation falls in about the middle of the cited spread, yielding a discount rate of 11 plus 8 or 19.0%.
To this discount rate he added a real property tax component of 2.29% (2.6 tax rate times 88% ratio) arriving at a total discount rate of 21.29% which he rounded to -21%. He then “presentworthed” his derived N.O.I. over a period of 16 years, stating: “Although the refinery will undoubtedly last far longer than that, the N.O.I. is presumed to be derived from the use of existing facilities,” and concluded: “the Present Worth of 1 per Annum for 16 years at 21 percent is 4.592., This is the monthly present worth factor divided by 12 (to put it in on an annual basis), since *275 refinery income and expenses are recorded monthly. The present worth of future N.O.I. is: $25,000,000 x 4.592 = $114,800,000.”
MARKET APPROACH.
Kline presented a market approach valuation for the tax years 1985,1986 and 1987; whereas the taxing districts through Paschall presented a market approach for the tax year 1987 only.
Kline testified that he performed an extensive analysis of the TC sale for 42.5 million dollars, considered the FTC consent order and the processing agreement simultaneously entered into and concluded that it was an arms-length transaction, thereby being a valid useable sale and the primary indicator of the subject property’s fair market value. He adjusted the sale by deducting 4 million dollars as being the value to Coastal of the processing agreement and he deducted the cost incurred by Texaco of 3.6 million dollars for clean-up costs, pursuant to ECRA’s requirement, to conclude a net sales price of 34.9 million dollars.
Kline also conducted a sales comparison approach by comparing the subject to comparable facilities that traded in the market place. He acknowledged that to justify a rational and supportable value of the subject by way of the sales comparison approach two adjustments must initially be made. First, an equivalent basis of comparison must be established; and, second, the market must be thoroughly searched on a national basis rather than locally or regionally. The two elements used in analyzing refinery sales are the capacity and the complexity of each sold refinery. In order to convert refineries to an equivalent basis of measurement for comparable sale purposes, Kline utilized a universal standard measurement of adjustment known in the industry as the “Equivalent Crude Capacity” [ECC]. The ECC adjustment is derived by multiplying the refinery’s atmospheric crude capacity by its Nelson Complexity Factor. The Nelson Complexity Factor was explained by Kline as follows:
An important feature to recognize and quantify is a refinery’s ability to produce large amounts of high value product from a barrel of crude oil. [Dr. Nelson, editor of The Oil and Gas Journal, developed numerical values to quantify this feature which has become known as the “Nelson Complexity Factor.”] The complexity *276 factor measures the relative investment cost of a given process, such as fluid catalytic cracking (FCC), to the basic crude distillation process investment cost, which is a base 1.0. For example, an FCC unit has a Nelson complexity of 5.5; this indicates it is more costly and complex and is therefore more productive in extracting high value product from a barrel of crude than a simple atmospheric crude unit. In the simplest terms, the higher a given refinery’s complexify, the greater amount of high-value product can be refined from a barrel of crude oil, thus producing higher value sales of refined product.
Relying upon historic data published in The Oil and Gas Journal, Kline developed Eagle Point’s Nelson Complexity Factor as follows:
Eagle Point Refinery Units MD/SD Nelson Complexify Factor Contribution
Atmospheric crude 95 1.0 1.00
Vacuum 31 2.0 .65
Visbreaker 13 2.0 .27
Fluid catalytic cracking 40 5.5 2.32
Catalytic reforming Naphtha hydro-5.0 2.00
treating Distillate hydro-43 2.0 .91
treating 30 2.0
Alkylation 3 11.0 .35
Polymerization 2.5 9.0 .24
Overall complexity: 8.37
Multiplying Eagle Point’s rated capacity for atmospheric crude distillation [95,000 BPSD] by its overall Nelson complexity factor of 8.37 results in 795,150 which represents Eagle Point’s ECC. By this adjustment Kline claims that refineries could be compared in the same manner as high-rise office building are compared on a square foot basis rather than by number of floors. The sale price of a refinery is divided by its daily capacity to calculate the unadjusted price per daily barrel which is then divided by the refinery’s Nelson Complexity factor to arrive at its E.C.C.
Kline utilized five comparable sales [apart from the subject] for the tax years 1985 and 1986 and two additional comparable sales for the tax year 1987 for Eagle Point Refinery whereby he concluded a market approach value for the three years.
*277 Sale # 1, Powerine to Sargent Holding was an August 1986 sale for 38 million dollars of a 46,000 BPSD refinery located in Santa Fe Springs, California which consisted of 88 acres. Its crude capacity was 46,000 BPSD and price per barrel was $826. Its Nelson Complexity was 9.47 resulting in an ECC price of $87 a barrel. Because this refinery is located in an area of “extremely high-value land” he adjusted it to $67 per ECC and an additional minus location adjustment of 10% to arrive at an adjusted total of $60 per ECC barrel.
Sale #2, Tosco to Texaco, located in Bakersfield, California, sold June 1986 for 22 million dollars. Its crude capacity was 40,000 BPSD and its price per barrel was $550. Its Nelson Complexity was 10.8 resulting in an ECC barrel price of $51. He adjusted this downward 10% for location and upward 25% for condition, for an adjusted total of $58 per ECC barrel.
Sale # 3, Arco to Atlantic, located in Philadelphia, Pennsylvania, sold September 1985 for 147 million dollars. He deducted the value of trademarks, goodwill, 332 service stations, excess land and terminals to arrive at an adjusted price of 37 million dollars. Its crude capacity was 130,000 BPSD resulting in a price per barrel of $285. Its Nelson Complexity was 10.96, reflecting an ECC barrel price of $26. No adjustments were made.
Sale #4, Quintanna to Coastal, located in Corpus Christi, Texas, sold August 1984 for 12 million dollars. Its crude capacity was 35,000 BPSD and price per barrel was $343. Its Nelson Complexity was 11.55 resulting in an ECC barrel price of $30. He adjusted it downward 5% because of location and upward 10% because of the units’ inferior condition for an adjusted total of $32 per ECC barrel.
Sale # 5, Gulf Oil to Thrifty Oil, located in Santa Fe Springs, California, sold August 1983 for 24 million dollars. Its crude capacity was 53,800 BPSD and price per barrel was $446. Its Nelson Complexity was 10.22 resulting in an ECC barrel price of $44. As in the other Santa Fe Springs sale, # 1, a 10% adjustment was made for location resulting in an adjusted total of $40 per ECC barrel.
*278 The above five sales reflect that the adjusted values per ECC barrel range from a low of $26 to a high of $60. He placed the greatest weight on the Arco-Atlantic transaction because of its proximity to the subject, both in physical location and in time of sale. His ultimate conclusion eame to $40 per ECC barrel; applying this to Eagle Point’s 795,150 ECC barrels equals $31,-806,000 which he rounded to 32 million dollars as Eagle Point’s value as of October 1, 1984 for the tax year 1985 by way of the sale comparison approach. He stated that these results confirmed his final conclusion that the T-C sale was the best indicator of value for the subject for the tax year 1985.
He then opined that the comparables used indicated there is no measurable adjustment for time difference between October 1, 1984 and October 1,1985; therefore, his sale comparison value for tax year 1986 was the same as the prior year.
For the tax year 1987 he used two additional sales. The first was Pester to Derby which sold April 1986 for 10.5 million dollars. Its crude capacity was 30 BPSD and the price per barrel was $350. Its Nelson Complexity was 8.51 resulting in an ECC barrel price of $40. Because of its slight inferiority and its Mid-west location he gave it an upward adjustment of 10% to a sub-total of $44 per barrel price, and a plus 20% for condition, for an adjusted total ECC barrel price of $53.
His second sale for 1987 was from Texaco to El Paso Refinery located in El Paso, Texas, which sold May 1986 for 14 million dollars. He deducted 1.3 million dollars for its terminal located in Midland, Texas, for a net refinery consideration of 12.7 million dollars. Its crude capacity was 18,000 BPSD and the price per barrel was $706. Its Nelson Complexity was 7.55, resulting in an ECC barrel price of $93. He gave a minus adjustment for location, stating the Texas location is superior, for a adjusted total ECC barrel price of $69. .
He further testified that his analysis of the above sales, together with the previous 1985-86 sales, suggests there has been a slight upward movement in refinery sales prices. He gave less weight to the Texaco-El Paso sale in his conclusion of value because of the *279 existence of a processing agreement and other agreements regarding the termination of employees at the facility and concluded a value indicated by the sale comparison approach for Eagle Point as of October 1,1986 to be $55.00 x 795,150 ECC barrels to equal $43,733,250 which he rounded to 44 million dollars. After weighing both his cost approaches and market approaches for the tax years 1986 and 1987, his final conclusions of value were 33 million dollars and 43 million dollars respectively.
Defendant’s expert, Paschall, also considered the sale comparison approach for the tax year 1987 in his valuation process. Both he and Robert H. Scrivens, another expert presented by defendants, rejected the Texaco-Coastal sale as being useable, because Texaco was not a willing seller and was compelled to dispose of the facility within a one year time frame, and because of the restrictions on the number of prospective purchasers to which the refinery could be marketed.
Paschall also utilized the ECC standard of measurement to compare sales of refineries to the subject, however, he utilized 9.3 as the subject’s Nelson Complexity factor claiming Kline’s 8.37 figure was incorrect.
In his market approach for the tax year 1987, Paschall considered the first two above-enumerated sales used by Kline plus five additional sales. As to the Powerine sale, he confirmed Kline’s reported sale price of 38 million dollars but dismissed its useability because a member of the Los Angeles assessor’s office told him that “because the sale was made by permission of a Bankruptcy Court, he [the assessor] considered that it was made under duress, therefore, he assessed it far in excess of its sales price.” Paschall further considered Kline’s adjustment to be improper and claimed that the appropriate ECC is $87.
As to the Tosco sale, he again confirmed that Kline’s 22 million dollar sale price and unadjusted ECC barrel price of $51 were correct. He considered Kline’s 5% negative adjustment for location to be unwarranted but accepted the plus 25% for condition even though he said he was not familiar with the basis for it, to arrive at an adjusted ECC of $64.
*280 He also considered the following five sales:
Sale # 1, Occidental to Southland located in Louisiana sold in 1988 for 336 million dollars. Its crude capacity was 330,000 BPSD and its Nelson complexity factor was 11.3 from which he derived an ECC barrel price of $90.
Sale # 2, Chevron to Sohio located in Louisiana sold in 1984 for 240 million dollars. Its crude capacity was 205,000 BPSD and its Nelson Complexity factor was 8.6 resulting in a ECC barrel price of $136.
Sale # 3, Texaco to Sinclair located in Oklahoma sold in 1983. Its sales price “was stated by Limbach[6] as being between $15-25 million.” Its crude capacity was 52,000 BPSD; its Nelson complexity was 8.5 and the ECC barrel price is “$34 and $57.”
Sale # 4, Continental Oil Co. to Pacific Oasis located in California sold in 1982 “at a time of economic distress in the oil industry” for 38.6 million dollars. Its crude capacity was 40,000 BPSD; its Nelson complexity was 5.2 and the ECC barrel price of $186. He said that the Los Angeles county assessor confirmed to him the sales price and told him “that the sale was made under duress because of DuPont’s necessary disposal of assets upon its acquisition of Continental.”
Sale #5, Gulf Oil Corp. to Thrifty Oil Company located in California sold in 1988 for “either 24 million dollars or 100 million dollars?” He said he talked with the Chief Financial Officer of the buyer and “all he would say of the two reported prices was: “why don’t you average the two?’ ” Paschall then spoke with the same member of the assessor’s office referred to in the “Powerine sale” and was told the price was 63 million dollars. He claims the refinery has a crude capacity of 51,500 BPSD; a Nelson Complexity factor of 10.2 and a derived ECC barrel price of $118.
Paschall then averaged the ECC values of the seven sales to arrive at an ECC barrel price of $96.5. He then ascribed to Eagle *281 Point the 105,000 BPSD listed on Texaco’s descriptive brochure, multiplied by 9.30 and again by 96.5 to arrive at his market value of $94,232,000 for the tax year 1987. In his report Paschall concluded: “My estimate of the Fair Market Value of all land and improvements as of 1 October 1986 is: 104 million dollars. My estimate of Replacements Cost Less Depreciation, whose use I have been advised by counsel is mandated by New Jersey law, is: $124,038,000.”
In summary, the subject property’s true values for the three years under appeal as proposed by the three experts, including the stipulated land values are as follows:
1985 1986 1987
Kline T-C Sale Market Cost 34,900,000 32,000,000 41,746,668 32,000,000 37,888,446 44,000,000 42,688,221
Final Value 35,000,000 33,000,000 43,000,000
Daniel Cost 107,851,340 104,476,611
Paschall
Market 94,232,000
Cost 124,051,695
Income 114,800,000
Final Value 124,051,695
It now becomes incumbent upon this court to appraise the various approaches to value presented herein.
INCOME APPROACH.
The court will first consider the value derived by way of the income approach. “The income capitalization approach is typically used in market value appraisals of income-producing property. ” Appraisal Institute, The Appraisal of Real Estate 413 (10th ed. 1992) (emphasis added). Appraisers use this approach to value when appraising income producing properties because it measures the present value of the expected future benefits of *282 ownership of the property. Id. Future benefits are commonly measured as the potential income attributable to the land and improvements. In examining use of the income approach as utilized here, this court is mindful of the admonition of Chief Justice Weintraub that
[i]n a given case capitalization of income may predominate ... [b]ut the problems to which we will now refer suggest the care with which the income method must be used and indicate as well that one should hesitate to accept its answer without checking against all available data.
The first problem is to find the fair rental value to which the capitalization rate will be applied.
[New Brunswick v. State Div. of Tax Appeals, supra 39 N.J. at 544, 189 A.2d 702 (emphasis added)].
Thus, it is incumbent first to ascertain the net operating income attributable to the real estate which is derived by deducting operating expenses from the fair rental value. I find that the net operating income utilized by Paschall is not the net operating income attributable to the plaintiffs real estate under appeal, but instead, being based upon sales volume, it is income attributable to the operation of plaintiffs business. As our Appellate Division stated:
In the present case the theory asserted is a formula based on sales volume and therefore is subject to the variables of goodwill and management practices which are factors entirely foreign to the true value of the real estate as such. For this reason the evidence adduced in this category was neither competent nor sufficient to establish the fair and full value of the property.
[McCrory Stores Corp. v. Asbury Park, 89 N.J.Super. 234, 241, 214 A.2d 526 (App.Div.1965) quoting Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 109, 89 A.2d 385 (1952)]
Income is an element to be taken into consideration only where the yearly rental is calculated to reflect the true value of the property and not, therefore, where the source of income is from business personal property. Gibbs v. State Bd. of Taxes and Assessments, 101 N.J.L. 371, 373, 129 A. 189 (E. & A.1925). The accepted method of valuation by the income approach is “to capitalize the income of the real property separate from the value of the business using the property.” Transcontinental Gas Pipe Line Corp. v. Bernards Tp., 111 N.J. 507, 521, 545 A.2d 746 (1988). To like effect is Twin Oaks Assoc. v. Morristown, 9 N.J.Tax 386, *283 394-95 (Tax 1987), aff'd 11 N.J.Tax 94 (App.Div.), certif. denied 117 N.J. 155, 564 A.2d 875 (1989), where the income produced is attributable not only to the real estate but also to personal property and services rendered by employees of the business located therein, the income does not constitute economic rent, therefore, the income approach is not appropriate. The income approach is inapplicable in the valuation of property for which a rental value cannot be identified. American Institute of Real Estate Appraisers, The Appraisal of Real Estate 315 (7th ed. 1978).
I conclude that Paschall’s unique income approach is unsupported by any recognized authority. The illogic of Paschall’s income methodology is readily apparent when his alleged N.O.I. is applied annually. Based thereon, the refinery had a negative value in 1986 which, of course, is a ludicrous result, and in 1987 its value was one-half of its 1985 value, which is contrary to his (and also defendants’ and Kline’s) conclusion that the refinery’s 1987 value increased substantially over 1985. Additionally, Paschail utilized a 19% discount rate. The capitalization method and rate used by him for the valuation of real property is unsupported by any data or recognized appraisal authority. I conclude that the income approach to value as used herein is so conjectural and clearly inappropriate that it does not meet the required standard of evidence to give it any acceptable weight; therefore, it will be disregarded.
COST APPROACH.
Next to be considered is the conflicting conclusions arrived at by the experts in their respective cost approaches. As previously noted, the sole issue in this regard is the amount of depreciation applicable to the improvements. Kline deemed the depreciated remaining value for the improvements to be $26,686,-698 compared to Daniel’s $92,791,370 for tax year 1985; and, $25,953,072 to $92,543,237 for 1986.
In addition to touring the facilities and making detailed physical observations of the improvements, Kline was provided access to all *284 of the plant’s records, such as drawings, corrosion allowances, information, etc., which he utilized to ascertain cost new and depreciation. He testified that:
Corrosion allowance is something that has to do with the deterioration, if you will, of the various wall thicknesses of the vessels that detracts from the physical usefulness of these bits of machinery and equipment and it does, in fact, assign a life. You could determine if a particular column or vessel is approaching the end of its useful life based on how thick or thin its walls are. This is done with sonic tests and so on. These are standard measurements that are taken at a facility to make sure that the plant is operating in a structurally sound and safe environment.
Kline similarly made an exhaustive and detailed analysis of most of the improvements and meticulously detailed his findings regarding them.
He then testified to a very detailed procedure utilized in arriving at his functional and economic obsolescence concluding a 70% obsolescence for economic condition. As a check on this figure he then performed what he called a “corporate accrual depreciation study” which, essentially is a form of market abstraction of accrued depreciation. Applying this market study to the subject, he determined ranges of from 82.6% to 94.8% as being the proper factor for economic depreciation.
Daniel utilized a 35-year useful life for the process equipment, a number he allegedly deduced from an article written by Mr. Nelson, however, cross-examination developed that he had never read the article nor understood how Nelson arrived at that age figure. Except for two minor “cannibalized” items, Daniel established an arbitrary age-life floor for physical depreciation at 70%, however, he admitted that he was unable to cite any authoritative support therefor, it being strictly his judgment even though Nelson, in the article allegedly relied upon by Daniel, does not recommend a floor for depreciation.
Daniel calculated functional obsolescence by simply deducting his replacements cost new from Kline’s stipulated reproduction costs. This calculation was made during the course of the trial after both experts had presented their respective appraisal reports and Kline’s figures were stipulated to be correct. Prior to that, Daniel had made no independent conclusion of functional obsolescence. It is recognized if both the reproduction cost *285 figures and the replacement cost figures are correct, the difference may constitute a form of functional obsolescence; however, although Kline’s cost figures were stipulated as correct, no such stipulation was entered into relative to Daniel’s figures. In arriving at his ultimate conclusion of functional obsolescence, he merely used his untestified-to replacement costs as constituting the property’s functionally depreciated value. There was no proof whatsoever submitted as to the accuracy of his replacement costs. His alleged conclusion was not a calculated, independent analysis by him of functional obsolescence; instead, it was an afterthought and nothing more than a pure mathematical exercise entitled to no weight. I find that although Daniel’s expertise apparently is as a cost estimator, his ability as an appraiser which requires expertise in quantifying depreciation is lacking.[7]
Kline’s 1987 depreciated remainder was $42,688,221 compared to $124,051,695 concluded by Paschall, defendants’ other valuation expert. Paschall estimated the economic life of Eagle Point to be 20 years; he utilized Kline’s reproduction cost figures but he appeared to misunderstand these stipulated costs to be replacement costs rather than reproduction. He posited that the only functional obsolescence was for the lack of a centralized control room. In his first report relative to 1985 and 1986, Paschall found that this functional obsolescence was 15 million dollars. In his second report, relative to tax year 1987 he found *286 no obsolescence. When he revised this report four months later, he concluded functional obsolescence of thirty-five million dollars for the tax year 1987 attributable to the multiple control rooms. In his initial 1987 report, he found the existence of seven million dollars of economic obsolescence, but in his revised 1987 report he determined there was no economic obsolescence.
I find Paschall’s entire cost approach and depreciation analysis to be extremely poor and deficient and his flawed conclusions are entitled to very little weight. Obviously, one reason for the poor quality of his appraisal is the small amount of time he spent at the subject refinery gathering information to prepare it. In contrast to the lengthy time and repeated inspections performed by plaintiffs expert, Paschall visited the Eagle Point refinery once only, for three hours. He toured the refinery area by car but never exited the car. He did not enter any building other than the administration building—a truly “windshield appraisal” of the refinery equipment.
Based upon Kline’s exhaustive and thorough analysis of the subject’s physical characteristics and its functional and economic obsolescence I find that his analysis of the reproduction cost less depreciation approach for each of the three years under appeal is far superior to and preponderates over the reports and testimony presented by defendants’ experts. Therefore, his depreciated cost conclusions are entitled to much greater weight than defendants’ two experts.
SALES COMPARISON APPROACH.
In arriving at his market conclusion, Kline testified that he examined the Texaco-Coastal sale to ascertain if it would independently qualify as a market comparable sale, and after interviewing the relevant participants and reviewing the sale documents and related information, he concluded that it was an arms-length transaction.
He then testified that he examined the market to determine whether there were sufficient sales of comparable refineries to utilize the sales comparison approach to value the subject indepen *287 dent of its sale and he concluded there were. By applying a Nelson Complexity factor and its concluded ECC to each of the comparable sales, he utilized a universal standard of measurement to compare the refineries. This methodology differs from Paschall’s rejected income approach in that by this method the goal is to measure a refinery’s economic capacity and complexity and not its net production as reflected in past profits which is greatly affected by ownership and management personnel. This standard was acknowledged to be a recognized approved method by Paschall who also utilized it in his market approach, although he calculated different ECC figures.
One of the problems which must be carefully monitored in the use of market data is to check to see that it is factual; therefore, it is imperative that the careful appraiser verify his data to the greatest extent reasonable. The validity of his conclusion depends upon the validity of his information. Appraisal Institute, The Appraisal of Real Estate 369 (10th ed. 1992). In examining sales of refineries for use in the sale comparison approach by way of the ECC method, next to physical similarity, the most important facts to be ascertained are the correct sale price and the correct ECC overall capacity. In comparing the two sales studies submitted I find that for many of the comparables utilized by Kline, the sales prices were obtained by him from his or his company’s appraisal of the sale property conducted on behalf of one of the parties, or by information they received from one of the participants to the sale. Paschall, on the other hand, secured several of the sale prices from members of the assessors’ offices in the Los Angeles area, which he accepted as correct without verification. His acceptance of the Gulf Oil-Thrifty sale price as testified certainly is not an acceptable appraisal practice. All the sale prices he used lacked any degree of certainty.
Paschall assigned to the subject an overall complexity factor of 9.30 compared to Kline’s 8.37. Kline computed his factor by using the figures listed in Nelson’s article published in the Journal of September 13, 1976. Paschall rejected Nelson’s figures for 1986 “because of serious inflation in the mid-to late 1970’s.” Instead, *288 he computed what he termed to be “current complexity factors using current replacement costs for refinery units.” He employed Kline’s 1985 reproduction costs, which he claimed he adjusted upward for 1% inflation from 1985 to 1986 and he increased Kline’s use of the plant’s capacity from 95,000 BPSD to 105,000 BPSD to arrive at a computed factor of 10.16. He then reduced the contribution factors of two units by 50% because of depreciation to arrive at his adjusted complexity factor of 9.30. There is no proof in the record to sustain a 1% inflation conclusion between 1985 and 1986 and by changing the cost new figures, it appears that Pasehall is violating the stipulation accepting Kline’s cost new calculations. Additionally, Pasehall’s use of a 105,000 BPSD capacity for the Eagle Point Refinery is contrary to Nelson’s published report and this court’s finding of the correct capacity to be utilized in the sale comparison approach. All of the sales considered as comparable by both experts utilized the BPSD capacity as reported for each refinery by Nelson. By using a capacity for Eagle Point different from the Nelson publication, Pasehall distorted the equivalent basis of measurement which is the foundation for this methodology. Accordingly, I find that Kline’s application of the sales comparison approach and his conclusion of value therefrom are far more persuasive than Paschall’s methodology or results.
The next issue to be determined is which of the methods of valuation introduced is most indicative of the subject’s fair market value and what, if any, weight is to be given to the T-C sale.
Ordinarily, the approach relied upon in valuing industrial, owner-occupied buildings such as the subject, is the cost approach; however,
[t]he cost methodology may result in serious error when depreciation in all forms is not objectively measurable. Therefore, most courts have utilized this method as the only approach in those limited instances in which no other method of valuation would yield an economically realistic value. 1 Bonbright, Valuation of Property, 175-76. This pragmatic position is reflected in the modem appraisal practice of relegating the cost approach to a secondary role because cost may not effectively reflect market conditions. O’Flaherty, “Cost Approach to Value,” Friedman, Encyclopedia of Real Estate Appraising (3 ed. 1978) 66-67.
*289 [J.C. Penney Co. v. Lawrence Tp., 8 N.J.Tax 473, 479 (Tax 1986), aff'd 9 N.J.Tax 635 (App.Div.1987)].
As this court has also observed:
The cost approach to value is a viable indicator of value when the improvements are new and all forms of depreciation are measurable. American Institute for Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978) 323. “Replacement cost has been recognized as mere evidence of value—fallible evidence at that.” 1 Bonbright, Valuation of Property, 150. However, when depreciation cannot be reliably measured the cost approach can lead to a distorted result. Id. at 175-176. The calculation of depreciation as applied to a property of fairly recent construction presents a baffling problem of appraisal technique. Id. at 161. To calculate it for improvements which are extremely old, obsolete and which would never be replaced in their original condition is almost impossible. It is quite obvious that utilization of the cost approach to value buildings as old and varied as the subject, which require such enormous depreciation percentages, cannot be relied upon.
[Congoleum Corp. v. Hamilton Tp., 7 N.J.Tax 436, 443 (Tax 1985)].
In the present case, plaintiff has posited depreciation from all causes of approximately 90%, on average, for the three years under appeal and defendants claim it should be “only” approximately 77%. The sheer magnitude of these adjustments directs a result that is extremely subjective and mandates that in this case the cost approach should not be accepted unless no other method of valuation would yield a more economically realistic value.
In the sales comparison approach, as previously noted, a most important fact is the sale price. In the case of refinery sales, the negotiations and ultimate agreement are extremely confidential and the sale price and other material facts are not readily obtainable. Although, for most of the sales, Kline had first-hand information of the purchase price received directly from one of the participants, in others he was required to rely upon newspaper reports and articles from trade periodicals and journals. Although this is not sufficient reason to disregard the expert’s testimony, see Glen Wall Associates, supra. 99 N.J. at 277, 280, 491 A.2d 1247 [an onerous burden of proof should not be placed on a taxpayer where it meets realistic and practical limits through its expert’s proofs], the possibility of incorrect sale prices, plus the amount of subjectivity required to allocate the value of the non-refinery property from the sale price and make adjustments for location, size and condition, indicates it also should be *290 used with caution and only where a better method is not available. “Mathematical calculations in appraisals, though made in the best of faith, can lead to divergent results and should be closely scrutinized” Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 106, 89 A.2d 385 (1952); and “one should hesitate to accept its answer without checking against all available data.” New Brunswick, supra, 39 N.J. at 544, 189 A.2d 702.
THE TEXACO-COASTAL SALE.
Next to be analyzed is the Texaco-Coastal sale and the weight, if any, to be accorded to it. In a judicial determination of a property’s taxable value, the price is not necessarily controlling but is evidential of its true value. Glen Wall Associates, supra, 99 N.J. at 282, 491 A.2d 1247. However, “it might under peculiar circumstances become controlling, subject to the limitation that the determination properly involved the weighing and appraising of all component factors and adventitious circumstances.” Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 162-63, 65 A.2d 828 (1949); Rek Investment Co. v. Newark, 80 N.J.Super. 552, 559, 194 A.2d 368 (App.Div.1963); Niktan Realty Co. v. Passaic City, 1 N.J.Tax 393, 399 (Tax 1980). Accordingly, all of the component factors and adventitious circumstances of the sale will be examined and weighed.
Although, normally a sale’s relevant facts are presented in evidence as admissable-hearsay by the experts, this case is unique in that here the key participating players for both seller and buyer testified extensively and in detail concerning the negotiations leading to the T-C sale.
James Seamans, Senior Vice President of Texaco, U.S.A., detailed his wealth of knowledge in the refinery business and his wide and diversified career with Texaco. Between 1978 and 1986, he was in charge of all refining, marketing, tax specialties and the pipelines company. During that period of time, he also was involved in implementing a policy by which Texaco would withdraw from 26 states in the mid-central area of the United States. In that capacity, he was in charge of the selling of all refineries *291 and marketing within the designated areas and in so doing he gained unparalleled experience and expertise in the selling and marketing of refineries. Additionally, he was appointed by the United States Department of Energy as chairman of a committee established to study the world-wide oil refinery operations to determine the operating capacity of all United States refineries. The study resulting therefrom was adopted by the Department.
In July 1984, the then Vice-Chairman of Texaco [who subsequently became Chairman and Chief Executive Officer], J.E. Kinnear, instructed Seamans that he was to be relieved of virtually all of his other assignments, and he was to be placed in charge of divesting Texaco of certain assets pursuant to the Consent Order. These assets included the subject property, a refinery in El Dorado, Kansas, and a small terminal in Maryland. Kinnear instructed him to enlist the aid of the investment banking firm of First Boston, with whom Texaco had a previous course of dealing, to aid him in developing all potential purchasers for the subject property, to coordinate the financing if necessary, and to help develop a descriptive brochure as well as to establish a marketing information center outside the facility. It was Texaco’s intention to develop potential purchasers on a world-wide bases. While it was believed that Texaco was competent on its own to develop the United States’ purchasers, they thought it useful to utilize First Boston to develop the international purchasing market. All documents regarding the refinery were transferred to this center which was utilized for the purpose of providing information to any prospective purchaser.
After Seamans and his aides evaluated the plant, based upon detailed analysis they established that they could sell the plant for 36 million dollars and they so advised Texaco’s Board of Directors who in turn granted to Seamans prior approval to sell the refinery at that price.
Seamans testified that while the FTC Consent Order stipulated that the facility was to be sold within a 12-month period, he felt no pressure from that stipulated time limitation believing that should *292 he be unsuccessful in selling the refinery within that period of time, the FTC would give him additional time in which to do so.
When the refinery was marketed, it was not offered with a processing agreement. Of the parties who received the brochure, seven visited the information center on several occasions and made an evaluation of the refinery. Of those seven, three actually made definite offers reasonable enough to be characterized as serious by Texaco.
During negotiations for- the sale of the subject, one of the major concerns of Texaco was the financial viability of any prospective purchaser. Texaco was concerned with the possibility of future liability regarding environmental problems, and additionally, if a purchaser was not able to finance a deal with the many problems associated with the running of a refinery, that these responsibilities might fall back onto Texaco. Seamans also alleged that under the Hart-Scott-Rodino Act [Hart-Scott-Rodino Anti-trust Improvements Act, 15 U.S.C.A. § 12 et seq.\ the FTC or the Justice Department would have been obligated to review any sale of this magnitude and that review procedure would have been the same as under the consent order.
After receiving the three offers, Texaco undertook detailed negotiations with each of the three parties. Seamans was personally involved in these negotiations which involved many meetings and took place over a period of several months. He testified that all three offers included either a processing agreement or an off-take agreement, or both. After analyzing all the offers, Seamans concluded that Coastal’s offer was by far the best.
During the earlier stages of the negotiations between Texaco and Coastal, Seamans had conversations with Oscar Wyatt, the Chairman of Coastal, and Fred Otto, its Senior Vice President. During Seamans’ initial meeting with Wyatt, Wyatt brought up the issue of a processing agreement and although Texaco wished to sell the refinery without any other obligations, it was amenable to considering a processing agreement since it would give the prospective purchaser the ability to pay more for the refinery than it otherwise would have paid.
*293 Thereafter for the most part Seamans negotiated with Daniel Hill, Senior Vice President of Coastal Corporation, who is also Chairman and Chief Executive Officer of Belcher Oil Company. Hill was in charge of all refining and marketing companies for Coastal Corporation and also the day-to-day marketing of refined petroleum products from the Gulf Coast through New England. Additionally, he was responsible for refinery acquisitions during the period of 1984 through 1987, working as part of a management executive negotiating team. He engaged in the acquisition of the Quintana-Howell Refinery in Texas; thereafter, he was in charge of selling Coastal’s Antwerp, Belgium, refinery which was negotiated in the summer of 1984. Subsequent to the purchase of the subject property, Hill negotiated the purchase of Coastal’s El Dorado Refinery in September 1985.
Hill testified that he became aware that the Eagle Point Refinery was for sale some time in July 1984 at which time he secured a brochure which was essentially an outline of the refinery’s assets and other pertinent factors. He was asked by Otto and Wyatt to evaluate the information in terms of its merit for further consideration. After reviewing the initial information he was of the opinion that the facility contained a substantial amount of obsolete assets. His analysis included a evaluation of the capability of the plant to compete in the market place, its cost of operation and the product slate which would be yielded by the refinery. He testified that one of the major obsolescence factors which he initially observed was the plant’s inability to process any crude oil other than sweet crude. He knew that sweet crude commanded a premium in the market place, therefore, the cost of raw materials would be relatively high. He learned that the plant had an outdated heat recovery system. He also observed that the plant was scattered over several hundred acres and, that the operating procedures of the plant took place from numerous control rooms which made it extremely expensive to operate from a personnel standpoint.
After performing the foregoing analysis, Hill stated that he came to the conclusion that an offer for the purchase of the subject property should be made in the area of 20 to 30 million *294 dollars. He conveyed this opinion to both Otto and Wyatt and subsequently had an in-house meeting with them and Jack Eckloff, Vice President of Refining, Marketing, Economics and Planning, wherein they discussed the possible purchase of the subject property. It was during this discussion that the issue of a possible processing agreement was considered by Coastal. A master negotiating team, with Hill serving as its lead manager, was developed by Coastal to negotiate the purchase of the assets of the subject property and the processing agreement. This team was divided into two sub-teams; one dealing with the assets and the second with the processing agreement. Both of these teams reported directly to Hill.
Jack Eckloff was primarily responsible for the valuation of various crude oils throughout Coastal’s domestic refining operations. He was also responsible for certain specialty projects with regard to new ventures, process .mergers and acquisitions, as well as capital-related economics. Eckloff had extensive experience as an economist and in the reviewing, analyzing and negotiation of processing agreements; therefore, he was enlisted by Hill to aid in the negotiation of the processing agreement. Eckloff noted that in his 19 years with Coastal he had analyzed literally hundreds of processing agreements with approximately 50 of them coming to fruition.
Hill stated that he made a presentation to the Board of Directors of the Coastal Corporation, advising them of the negotiations with Texaco regarding the purchase of the plant and also the processing agreement. In his analysis, Hill proposed that the plant was worth 42.5 million dollars which incorporated the value ascribed to the land and economic benefit estimated on the processing agreement. Believing that the economic benefit flowing from the processing agreement would be at least 20 million dollars, the Board of Directors, approved the transaction as proposed by Hill.
On cross-examination, Hill testified that during his negotiations he was unaware of and unconcerned with the requirements of an FTC consent order and, further stated, he would not have ac *295 quired the refinery without a processing deal. He stated he was concerned with not only how much Coastal was paying for the subject property, but also how much it would earn on the processing agreement and that the processing agreement was necessary in order to permit the Coastal Corporation to develop a market in the Northeast. It was simply an issue of economics; without the processing agreement Coastal would have had to locally market 90,000 barrels of products a day which would have had a negative effect on the market price of those products. Hill further testified that he subsequently had over 100 meetings with the Texaco negotiating team, approximately six of which were at the plant site itself.
Texaco’s negotiating team was also broken down into two sub-teams; one team was charged with the assets sale and the other with the negotiation of the processing agreement. Seamans testified that they negotiated almost on a weekly basis during which time he reported directly to Kineer.
Eventually, at a meeting between representatives of . both parties Hill proposed an offer to purchase the plant at the price of 42.5 million dollars. This offer was contingent upon the negotiation of a processing agreement which would have independent economic viability.
Both Seamans and Hill testified that negotiations for the sale of the assets and the processing agreement took place on a weekly basis over the next several months until the parties agreed on a sale price of 42.5 million dollars for the refinery. After agreeing to the refinery’s purchase price, they then negotiated the processing agreement which both claimed was separately entered into.
Engaged with Hill in his negotiation of the processing agreement, was Eekloff, Coastal’s specialist in this area. Their original proposal for the processing agreement was an accord for a term of five years at 50,000 barrels a day, with a fee of $2.90 a barrel. This was contingent on an agreed-upon yield structure which would be returned to Texaco. Hill testified that equally important to Coastal from an economic standpoint was the product-yield structure to be returned to Texaco. Hill stated that the yield *296 structure was a very important element from Coastal’s standpoint inasmuch as the difference between what was returned to Texaco and what was actually produced [and retained] by Coastal would be an account receivable by Coastal in addition to the processing agreement per barrel cost. The less product that had to be returned to Texaco, the more profit they made. Additionally, Texaco would have the responsibility of the carrying costs associated with maintaining at Eagle Point the operating inventories on the amount of the product to be produced. Texaco rejected this initial offer after which Coastal modified it to offer a three-year agreement at 50,000 barrels a day, with the other terms of the offer remaining the same. Texaco responded with a counter offer.
Negotiations continued for the purchase of the processing agreement and after a few additional meetings Coastal then offered to reduce the cash payment portion of the processing fee to $2.50 a barrel which Hill said was Coastal’s bottom-line offer.
At this point none of the yields had been agreed upon. Coastal’s initial offer relative to the yield structure was to return to Texaco 95.5% of the finished product; Texaco countered that proposal with a return of 98.7%. Coastal increased its offer to 97.7%. Hill claimed that based upon a 97.7% by volume of crude oil returned to Texaco, Coastal would gain a 4.5% or better result per barrel[8] which he alleged equated to an additional profit equal to $1.10 a barrel. Finally, Seamans and Hill settled upon a processing fee of $2.50 with a yield structure to be returned to Texaco in the amount of 97.7% of each barrel processed. Seamans testified that $2.50 a barrel was in line with other Texaco processing agreements. Hill further testified that subsequent to purchasing the subject property, Coastal was able to increase the volumetric return on a barrel of processed crude at an additional 2.2%.
Another major part of the negotiation of the processing agreement was the amount of inventory to be maintained at the refinery by Texaco. It was agreed that Texaco was to maintain at least *297 750,000 barrels at the refinery in operating inventories at all times. As a result of Texaco’s maintaining these operating inventories, according to Hill, over the three year period Coastal was being provided with roughly 20 million dollars of working capital.
The terms of the processing agreement additionally provide that after a period of two and one-half years Texaco had a right to elect to phase down the output of crude it was required purchase. During the third year of the agreement, Texaco served Coastal with notice to phase down and terminate the processing agreement. Thereafter, negotiations took place between the two corporations in which Texaco sought to pay a substantially reduced fee and receive a significantly increased yield structure; Coastal countered by offering Texaco a reduced fee but the same yield structure as initially negotiated in the processing agreement. During these negotiations, Texaco exercised its option to cancel the agreement by giving six months’ notice, Texaco’s personnel being of the opinion that Texaco could do as well, if not better, by processing the Minas crude at its Port Arthur facility or another Texaco refining facility rather than the processing agreement at Eagle Point. Although thereafter Hill offered Texaco a reduced fee in the amount of $2.25 a barrel, Texaco refused it and the agreement was not revived by Texaco.
Seamans further testified that subsequent to the signing of the agreements regarding the sale and the processing agreement there still remained open issues such as the fact that the facility was required to be cleaned up pursuant to ECRA’s requirements, the cost of which was considered to be substantial; therefore, approximately 1 million dollars was escrowed to comply with the cost of testing and cleaning up any environmental problems. He stated that a total of approximately 3.6 million dollars was paid thereafter to clean up the facility which included the foregoing 1 million dollars.
At trial, both Texaco and Coastal claimed that each of them had “the better of the deal” from the processing agreement. Seamans believed that the agreement was advantageous to Texaco because it would have cost Texaco more than $2.50 a barrel to have the oil *298 processed elsewhere. Hill and Eckloff testified it was their belief that Coastal could make a profit of over twenty million dollars over the three-year term of the agreement. Kline believed that the agreement resulted in a benefit to Coastal and a detriment to Texaco of four million dollars which sum he deducted from the sale price. Defendants’ expert, Richard F. Kilgore, president of a petroleum consulting organization, analyzed the agreement and concluded that it provided an additional financial return to the seller and an additional financial cost to the buyer over and above the sales price. Defendants contend that Coastal suffered a loss of between $.90 and $1.90 a barrel which, discounted over a three year period from 18% to 20%, would represent a loss ranging from $27,176,739 to $60,864,000 and that this sum should be added to the purchase price.
To prove their respective contentions, extensive and thorough discovery was completed by extremely diligent and competent counsel for both parties and voluminous formulae, testimony and evidence were presented by them to establish a value for the processing agreement. However, because of complicated cost and expense accounting and bookkeeping allocations, neither party was able to establish the correctness of its respective claim. In fact, even Kilgore, defendants’ petroleum processing expert, who was retained by defendant specifically to establish that the processing agreement was an asset to Texaco, testified that “any allocation of joint costs tends to be, to a considerable extent, arbitrary and, hence, subject to criticism as such” and “precise quantification is somewhat elusive.”
Nevertheless, this court concludes that which party “after the fact” benefited from the agreement is immaterial. The real question to be answered is: What were the projected valuation conclusions of the parties at the time the two agreements were executed and were those values added to, or subtracted from the purchase price? It is clear from the testimony of both principals that each team of experts was well informed and extremely knowledgeable about the costs of processing a barrel of crude oil and the amount of profit possible from the product-yield-structure. *299 With their respective knowledge and experience, each team believed that the processing agreement as finally executed was advantageous to its respective company. It is possible, and probable, that both were correct—in almost every agreement of sale between large manufacturers, the vendor and vendee each believes the agreement is beneficial to itself and most of the time it is, otherwise, no agreement of sale would ever be consummated. Accordingly, I conclude that the processing agreement was a separate and distinct agreement which had no effect upward or downward on the refinery’s real-estate sale price. This conclusion is buttressed by Seamans’ testimony that the 42.5 million dollar purchase price was established before the processing agreement was finalized. And certainly, if the agreement was worth as much to Texaco as defendants claim, the latter would not have terminated the agreement.
As heretofore stated, after completing his market analysis, Kline concluded that it confirmed his use of the subject’s sale as Eagle Point’s best indicator of value and he used it as the basis for his final conclusion of value. Conversely, defendants allege that the sale is not useable because Texaco was compelled by governmental decree to dispose of the refinery within a one-year time frame into a soft market in which two major competing facilities were also available. Defendants offered in rebuttal to Kline’s conclusion the testimony of Robert H. Scrivens, a real property valuation appraiser. He was of the opinion that Kline failed to properly analyze, and was unaware of, facts which directly affect the validity of the sale. It was his opinion that the sale did not meet the requirements of a “willing seller” and the time frame was insufficient to properly market the refinery; therefore, he considered the sale to be non-useable and that the best indication of value is the cost approach. Daniel and Paschall also considered this sale not to be arms length.
The determination of the evidential value and weight to be given to the testimony of conflicting experts is for the trier of the facts and this weight depends upon their candor, intelligence, knowledge, experience, and especially upon the facts and reason *300 ing which are offered as the foundation of their respective opinions. Ocean County v. Landolfo, 132 N.J.Super. 523, 528, 334 A.2d 360 (App.Div.1975); Trenton v. John A. Roebling Sons Co., 24 N.J.Super. 213, 219, 93 A.2d 785 (App.Div.1953); Delaware, L. & W. R. R. Co. v. Hoboken, 16 N.J.Super. 543, 85 A.2d 200 (App.Div.1951), rev’d on other grounds 10 N.J. 418, 91 A.2d 739 (1952). Scrivins had no experience in the appraising or sale of oil refineries nor did he testify to any knowledge relative to the FCC’s control and review of refinery sales. His expertise apparently is in the field of valuation of land and non-refinery real estate. I find that he lacked the knowledge and experience to analyze and quantify either the consent order or the useability of the sale as a comparable. Daniels likewise was deficient in this respect.
In Paschall’s first report, which was intended as a rebuttal to Kline’s report, he critiqued the comparable sales used'in Kline’s market approach which included Kline’s use of the T-C sale but he made no objection to it. In his second report he accepted the sale, but concluded the sale price was incorrect and should be adjusted upward, commenting that the processing agreement was “an obligation equivalent to a debt” which was to be added to the purchase price of 42.5 million dollars. In his third report, he claimed the sale could not be termed an arms length transaction because of the consent order; giving as his reason for his change of opinion the receipt of corrected cost data pertaining to the processing agreement received between the dates of the two reports. Why he was not consistent with his earlier conclusion that the processing agreement was an increased value to Coastal to be added to the purchase price [which is the legal contention of defendants if the sale is considered useable] was not satisfactorily explained. By subsequently receiving correct cost figures, all that was required was to recalculate his alleged value for the processing agreement and adjust the sales price upward. It was quite apparent that Paschall amended his conclusion in an attempt to circumvent a prior statement damaging to defendants. His general statements and responses negatively affected his credibility.
*301 Kline’s resumé and testimony reflects that he has extraordinary qualifications in the appraising of oil refineries. Prior to his present employment, he was a member of the American Associates of Cost Engineers, holding the designation, Certified Cost Engineer and he was involved in the designing and costing of several refineries and geothermals. He has appraised numerous refineries including some of those used here as his comparables and he was familiar with the market in which these refineries sell. He performed an exhaustive investigation of the subject sale, interviewed all of the expert participants from both companies [who had analyzed the true value of the refinery and had negotiated the ultimate sales price] and concluded that the consent order placed no undue duress upon the seller nor gave the buyer an advantage. This court was greatly impressed with his knowledge and expertise relative to refineries and with the candor with which he responded to cross-examination and questions from the court.
Accordingly, based mainly upon Kline’s testimony together with the testimony, as hereinabove delineated, of the expert negotiators from both companies who actively participated in the sale, I find that the sale should not be excluded from consideration, but instead, it is accepted as evidence of the property’s true value.
A current definition of market value is:
The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.
[Appraisal Institute, The Appraisal of Real Estate 20 (10th ed. 1992).]
“This definition is sufficiently broad to encompass most transactions.” Glen Wall Associates, supra, 99 N.J. at 282, 491 A.2d 1247.
In evaluating the subject sale, I have weighed and appraised the various factors surrounding the sale to determine whether there were such special circumstances which had a tendency to depress the sale price of the property without affecting its true value, or whether the sale price was correct. Compare 1530 Owners Corp. v. Fort Lee Borough, 263 N.J.Super. 382, 385, 622 A.2d 1350 (App.Div.1993) (A claim that a sale between related *302 parties should have been excluded from consideration as a useable sale because it did not constitute a sale between a willing seller and a willing buyer may be rejected by the trial judge where there was no direct evidence that the sale price was less than what a willing buyer would have paid to a willing seller—that the sale price in fact was below market value.) I find that the subject property was ably and professionally exposed to the refinery marketplace not only in the United States, but, with the aid of First Boston, worldwide, for a sufficient length of time to attract a reasonable number of buyers. The expert teams assembled by seller and buyer to negotiate the sale were extremely knowledgeable and fully informed about the subject refinery. They acted prudently and to the self-interest of their respective employers and the result was a fair sale.
Despite the consent order, I find that Texaco was not unduly pressured or coerced in its sale negotiations to the extent of rendering Texaco an unwilling seller as contemplated in the appraisal context of a useable sale. Today, almost all sales of real estate have some type of governmental restriction. “There are very few government restrictions on open and free competition. Real estate markets, on the other hand, are not self-regulating. Federal, state, county, and local regulations govern the ownership and transfer of real estate.” Appraisal Institute, supra, at 47. I accept Seamans’ statement, which was unrefuted, .that regardless of the consent order, a refinery sale of this magnitude would have been reported to the FTC for its review and scrutiny pursuant to the Hart-Scott-Rodino Anti-Trust Improvements Act, supra. The final contract, entered into after almost six months negotiations, resulted in a fair sale. Considering the profound expertise and exceptional qualifications of Texaco’s negotiating team and the amount of time expended in negotiating this sale, it would be illogical to accept, as defendants’ experts claim, that they agreed to a sale price approximately one-third its true value. I find that the T-C sale has met all of the requisites of market value. After considering and weighing the cost approach, the sales-comparison approach and the sale of the subject, I conclude that the sale price of the subject property is the best indicator of its value. Accord *303 ingly, I find that the true value of the subject property for the tax year 1985 is its sale price of 42.5 million dollars without any claimed deduction or increase for the processing agreement.
Coastal also seeks a reduction of 3.6 million dollars from the sale price based upon its allegation that it expended that sum for environmental clean-up of the property pursuant to ECRA requirements. Defendants object, claiming clean-up costs are the responsibility of the seller and since the clean-up has been completed, the true value for assessment purposes should not be lowered, citing our Supreme Courts’s decision in Inmar Assocs., Inc. v. Carlstadt, 112 N.J. 593, 549 A.2d 38 (1988). Without deciding the legal defense raised by the taxing districts, I find that plaintiff has failed to submit sufficient proofs to establish factually the contaminated condition of the property, its ECRA clean-up requirements, what work was completed and proof of the exact costs incurred. They merely introduced the generalized statement of Seamans that “approximately 3.6 million dollars was paid to clean up the facility.” This does not meet the standard of proof required, therefore, this claimed reduction from the sale price is also denied.
Kline testified that in his opinion there was no measurable adjustment for the time difference between October 1, 1984 and October 1,1985; therefore, his value for the tax year 1986 was the same as the prior tax year. In accordance therewith, I find that the true value of the property for the tax year 1986 is also 42.5 million dollars.
Since this court has relied upon the market sale price of the subject property to conclude its value for the first two years under appeal, to be consistent, I will also apply the market approach for the tax year 1987. Kline concluded in his market approach that the subject property increased in value between October 1, 1985 and October 1986 to the extent of twelve million dollars. Defendants also claimed that the refinery increased in value in 1986 but did not delineate the amount of increase. Accordingly, I accept Kline’s conclusion of twelve million dollars increase in value and *304 add that sum to the 1986 tax year value. For the tax year 1987 I find the true value of the subject to be 54.5 million dollars.
The West Deptford assessments for all three years reflect exemptions for pollution equipment of $8,945,900. Kline reported that this sum represents the original reported cost Texaco incurred for the following pollution control equipment: waste water treating unit, Edward’s vapor recovery unit, and various structural towers. Kline estimated the current cost new of these exempt items by trending the original costs to the present, utilizing the Nelson refinery inflation index as reported quarterly in The Oil and Gas Journal which he calculated as $12,655,000. He then applied an overall accrued depreciation rate of 97% which amounted to $11,769,000. Deducting this amount from his cost new results in an estimated value of $886,000 for this exempt pollution equipment. This depreciated value is included in the above-determined final true values. Defendants offered no rebuttal to Kline’s opinion; therefore, the pollution control equipment exemption will be reduced from $8,945,900 to $886,000 for each of the three years in issue.
The above true value determinations represent the property’s total value as a single economic unit. It is apparent that after allocation of the assessments, application of the Chapter 123 average ratios is in order for each of the assessments under appeal except Westville Borough’s assessments for the tax year 1987 which were at 100%. In accordance with their stipulations and pursuant to B. 8:9-3, the parties will submit a form of judgment containing computations of the correct amounts of the reduced assessments, based upon the true values determined herein, as allocated between the two defendant taxing districts.

 On May 20, 1985 only 936 acres of then Block 1, Lot 1 were conveyed to Coastal; Texaco retained title to that portion of Lot 1 now known as lots 7, 8 and 9; however, in 1985 they were all assessed as a single line item.

 Prior to the 1986 assessment date approximately ten acres of Block 71, Lot 22 were sold to a third party.

 In pretrial discovery, Paschall's name was not included as a valuation expert for the tax years 1985 and 1986; therefore, his testimony was limited to rebuttal of plaintiff's valuations for those years.

 The storage tanks’ cost new figure was stipulated to be $52,358,000.

 Paschall incorrectly used $11,356,000 as the stipulated land cost to arrive at a value of $124,038,000.

 J.N. Limbach was Senior Research Engineer with Shell Oil Company who, in September 1985, wrote a paper titled "Petroleum Refinery Valuation, Market Data Approach.”

 It is noted that Judge Andrew of this court had previously reached a similar conclusion as to this witness when he stated:
As a matter of fact, Daniel conceded that he did not have a lot of experience in estimating fair market values nor was he familiar with the extremely important appraisal concept of economic or external obsolescence. Daniel’s conclusion as to depreciated replacement costs can only have validity in this proceeding if those conclusions can be equated by this court with the concept of fair market value as set forth in N.J.S.A. 54:4-23. In this context, it must be noted that “cost estimating is not appraising,” but is rather only "one step in the appraisal process.” See International Association of Assessing Officers, Property Assessment Valuation (1977) at 136.
[Chevron U.S.A., Inc. v. Perth Amboy, 10 N.J.Tax 114, 143, n. 19 (Tax 1988), aff'd 11 N.J. Tax 480, 237 N.J.Super. 280, 567 A.2d 597 (App.Div.1989)]

 Concluding a deemed total finished product yield of 102.2%.