## TAX COURT OF NEW JERSEY

**JOSHUA D. NOVIN**
**Judge**



Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

## NOT FOR PUBLICATION WITHOUT THE APPROVAL
## OF THE TAX COURT COMMITTEE ON OPINIONS

November 8, 2021

Robert E. Spiotti, Esq.
Spiotti & Associates P.C.
271 U.S. Highway 46 Suite F105
Fairfield, New Jersey 07004-2471

Joseph McGlone, Esq.
O'Toole Scrivo, LLC
14 Village Park Rd
Cedar Grove, New Jersey 07009

>      Re:    Slim & Thin LLC v. West Caldwell Township[1]
>             Docket Nos. 012929-2018, 007971-2019, and 012768-2020

Dear Mr. Spiotti and Mr. McGlone:

This letter constitutes the court's opinion following trial of above-referenced local property tax appeal matters. Slim & Thin, LLC ("Slim & Thin") challenges the 2018, 2019, and 2020 local property tax assessments on improved property that it owns in West Caldwell Township ("West Caldwell"), Essex County, New Jersey.

For the reasons stated more fully below, the court affirms the 2018, 2019, and 2020 tax year assessments.

---

[1] At commencement of trial, the 2019 Case Information Statement reflected "Conforti, Nicholas & Irma," as the plaintiff/taxpayer. On April 28, 2021, the court entered a Consent Order to Correct Data amending the 2019 Case Information Statement to reflect Slim & Thin, LLC, as the plaintiff/taxpayer.







### I. Procedural History and Findings of Fact

Pursuant to R. 1:7-4, the court makes the following factual findings based on the evidence and testimony introduced during trial.

As of the valuation dates at issue, Slim & Thin was the owner of the real property and improvements located at 811 Passaic Avenue, West Caldwell, Essex County, New Jersey. The subject property is identified on West Caldwell's municipal tax map as block 1300, lot 2 (the "subject property").

The subject property is improved with a one-story, rectangular, masonry and steel building comprising 4,579 square feet, on an irregularly shaped 2.024-acre site. The lot is situated between, and has vehicular ingress and egress to, Passaic Avenue, a four-lane roadway, and Fairfield Avenue, a two-lane roadway. The site contains parking for approximately eighty cars. The lot has 228.71 feet of frontage along Passaic Avenue, a northern boundary sideline depth of 321.23 feet, a southern boundary sideline depth of 399.22 feet, and 231.54 feet of frontage along Fairfield Avenue.

The property is operated as a restaurant and bar under the name The Brook Tap House. The building is comprised of a dining area, bar, kitchen, bathrooms, office area, and a heated basement (containing various storage areas, a walk-in refrigerator/freezer, and mechanical systems). The building was constructed in 1972 and "gut renovated" between 2018 and 2019. Slim & Thin incurred approximately $300,000 to renovate and convert the property from a hibachi restaurant to the current restaurant and bar.[2] The restaurant and bar commenced operations in or about 2019.

---

[2] During trial, the extent that the renovations contributed to the overall building condition was disputed. Slim & Thin's expert (as defined herein) maintained that the subject property was in






The subject property's lot is dissected by the S. Branch Greenbrook stream/brook. The building and a portion of the parking area are on the front section of the lot. The rear section of the lot contains an asphalt parking area. A concrete bridge provides vehicular and pedestrian access, connecting the rear portion of the lot to the front portion. The subject property is principally in Special Flood Hazard Area AE, denoting an elevation possessing a "1-percent annual chance [of] flood[ing] . . . or 100-year flood," and requiring flood insurance.[3] However, according to Slim & Thin's expert, the building is "raised above the flood stage."

The site is serviced by public utilities, including municipal sewer and water, natural gas, and electric.

The subject property is in West Caldwell's M-1 Limited Manufacturing District with permitted principal uses that include light manufacturing, fabrication, processing, and handling of products; research, scientific and medical institutions, and laboratories; and banks and other financial institutions. Conditional uses in the zoning district include indoor recreational and health facilities, professional offices, and self-storage facilities. Thus, operation of the subject property as a restaurant constitutes a legal, non-conforming use.

Slim & Thin timely filed complaints challenging the subject property's 2018, 2019, and 2020 tax year assessments. West Caldwell did not file any counterclaims. The court tried the matters to conclusion over several days.

During trial, Slim & Thin and West Caldwell each offered testimony from a New Jersey certified general real estate appraiser, who the court accepted as experts in the field of real property

---

average condition. Conversely, West Caldwell's expert (as defined herein) maintained that the renovations rendered the subject property in good condition. Based on the court's review of the photographs and testimony, the court finds that the subject property is in good condition.

[3] https://www.fema.gov/glossary/flood-zones.






valuation. Each expert prepared an appraisal report containing photographs of the subject property and expressing opinions of the subject property's true or fair market value. As of each valuation date, the subject property's local property tax assessment, implied equalized value, and the experts' value conclusions are set forth below:

| Valuation date | Tax Assessment | Average ratio of assessed to true value | Implied equalized Value | Slim & Thin's expert | West Caldwell's expert |
|---|---|---|---|---|---|
| 10/1/2017 | $1,385,700 | 90.48% | $1,531,499 | $1,120,000 | $1,605,000 |
| 10/1/2018 | $1,385,700 | 89.59% | $1,546,713 | $1,110,000 | $1,565,000 |
| 10/1/2019 | $1,385,700 | 90.63% | $1,528,964 | $1,110,000 | $1,660,000 |

Trial testimony revealed that Slim & Thin purchased the subject property on August 3, 2017, for reported consideration of $1,000,000. West Caldwell's municipal tax assessor identified the subject property's sale as non-useable for purposes of the Director, Division of Taxation's sales-ratio study.

## II.  Conclusions of Law

### A.  Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105






(1952). Thus, at the close of the taxpayers' proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

At the close of Slim & Thin's proofs, West Caldwell moved to dismiss these matters under R. 4:37-2(b). Affording Slim & Thin all reasonable and legitimate inferences which could be deduced from the evidence presented, the court concluded that Slim & Thin produced cogent evidence sufficient to overcome the presumption of validity. The opinions of Slim & Thin's expert, if accepted as true, raised debatable questions as to the validity of the subject property's tax assessments. Accordingly, the court denied West Caldwell's motion and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate






to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer. . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

B.    Highest and Best Use

An indispensable element not only to principles of property valuation, but to the determination of the true market value of property is discerning its highest and best use. Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b., 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992). See also General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005). "For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Bor., 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." Ford Motor Co., 10 N.J. Tax at 161.

The highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

   

However, the highest and best use of a property is not a static principle. The highest and best use of a property may alter over time with a market that is in transition, or from changes in the economic climate, zoning, or the presence or lack of development. When engaging in a highest and best use analysis, the appraiser must interpret "the market forces that affect the subject property and identify[] the use or uses on which the final opinion of value is based." Appraisal Institute, The Appraisal of Real Estate, 42 (14th ed. 2013). An appraiser must closely examine the parcel being appraised "for all possible uses and that use which will yield the highest return should be selected." Inmar Associates, Inc. v. Edison Twp., 2 N.J. Tax 59, 64 (Tax 1980). Thus, the highest and best use analysis is truly a "function of the market." Entenmann's Inc., 18 N.J. Tax at 545.

Here, although both experts opined that the "as improved" highest and best use of the subject property was the continuation of its current use as a restaurant, their opinions diverged with respect to the "as vacant" highest and best use of the subject property. In Slim & Thin's expert's opinion, because a stream/brook intersects the site, "you're really limited to building on only half the site." In his estimation, there was inadequate land to construct an industrial building on the property. According to Slim & Thin's expert, "when I looked at the various uses, it's really hard to say that you can build a light industrial type of building here, there's just not the space to do it, I thought that a commercial use would be the best use for this property . . . if it was vacant." Thus, without identifying a specific use, Slim & Thin's expert opined that the "as vacant" highest and best use of the subject property was "for development of a commercial facility."

Conversely, after examining the permitted uses in the M-1 zoning district, West Caldwell's expert concluded that both a bank and an industrial warehouse were legally permissible, physically possible, and financially feasible. Using the 4,579 square foot building as evidence that a reasonably sized building can be constructed on the site, West Caldwell's expert opined that an






adequately sized bank or industrial warehouse building could be erected. However, after examining the surrounding market, West Caldwell's expert found that the subject property's area was saturated with banks; thus, a bank would not produce a maximally productive use. Accordingly, West Caldwell's expert concluded that the highest and best use of the subject property, as vacant land, was for use an industrial warehouse.

Here, the court finds the "as vacant" highest and best use analysis and conclusion reached by West Caldwell's expert to be more reliable and credible.

C.    Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Glen Rock Bor., 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)). See also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986). However, when the proofs submitted in support of one approach overshadow those submitted in support of any other approach, the court may conclude which approach should






prevail. See ITT Continental Baking Co., 1 N.J. Tax at 244; Pennwalt Corp. v. Holmdel Twp., 4 N.J. Tax 51 (Tax 1982).

When a property is income producing, the income capitalization approach is the "preferred method for estimating the value of income producing property." Forsgate Ventures IX, LLC v. Twp. of South Hackensack, 29 N.J. Tax 28, 46 (Tax 2016), aff'd, 31 N.J. Tax 135 (App. Div. 2018). See Parkway Vill. Apartments Co. v. Cranford Twp., 108 N.J. 266, 269 (1987) (concluding that "[t]he income method is generally preferred for assessing income-producing property"); TD Bank v. City of Hackensack, 28 N.J. Tax 363, 378 (Tax 2015); Shav Associates v. Middletown Twp., 11 N.J. Tax 569, 578 (Tax 1991).

Although the subject property is owner-occupied, both experts agreed that the income capitalization approach is the most appropriate method for estimating the subject property's true or fair market value. The court agrees with the experts, finding that the income capitalization approach is the method best suited for determining the subject property's true or fair market value.

### 1. Income Capitalization Approach

"The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." The Appraisal of Real Estate, at 439. See Parkway Village Apartments Co., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Princeton Borough, 16 N.J. Tax 68 (Tax 1996).

Central to the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments Co., 108 N.J.






at 270. Market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). The economic or market rent allows an appraiser to accurately forecast the stream of income to be generated by a property and to convert that future benefit into a present value.

### A. Market or economic rent

#### 1. Slim & Thin's expert

In performing his income capitalization approach, Slim & Thin's expert's appraisal report identified six restaurant leases executed between February 2015 and March 2018. However, after preparing the appraisal report and in preparation for trial, Slim & Thin's expert discovered that one of the leases was a "land lease and not a lease of the building." Thus, Slim & Thin's expert asked the court to exclude that lease from consideration.[4] The remaining five comparable leases were identified under the appraisal report as follows: (i) comparable lease 1 - Secaucus, Hudson County; (ii) comparable lease 2 - Wayne, Passaic County; (iii) comparable lease 3 - Pompton Plains, Morris County; (iv) comparable lease 4 - East Brunswick, Middlesex County; and (v) comparable lease 6 - Fort Lee, Bergen County. The reported unadjusted rents ranged from $16.52 to $30.58 per square foot. Slim & Thin's expert applied a -15% location adjustment to comparable lease 2 and comparable lease 4 to account for their perceived superior locations. The reported

---

[4] The lease was identified in Slim & Thin's expert's appraisal report as comparable lease 5.






adjusted rents ranged from $16.52 to $26.00 per square foot. Ultimately, Slim & Thin's expert concluded a market rent of $22.00 per square foot for the 2018, 2019, and 2020 tax years.

###   2.   West Caldwell's expert

In performing his income capitalization approach, West Caldwell's expert identified five restaurant leases executed between May 2011 and September 2019. The comparable leases were identified under his appraisal report as follows: (i) comparable lease 1 – Fairfield, Essex County; (ii) comparable lease 2 – Fairfield, Essex County; (iii) comparable lease 3 – Morristown, Morris County; (iv) comparable lease 4 – Roseland, Essex County; and (v) comparable lease 5 – Palisades Park, Bergen County. The reported unadjusted rents ranged from $20.43 to $33.69 per square foot. West Caldwell's expert applied condition adjustments of +20% to comparable lease 1, +15% to comparable lease 3, and -10% to comparable lease 5 to account for their perceived inferior and superior condition. The reported adjusted rents ranged from $23.81 to $33.74 per square foot. Ultimately, West Caldwell's expert concluded a market rent of $28.50 per square foot for the 2018, 2019, and 2020 tax years.

###   3.   Court analysis

The first issue the court must resolve is whether the subject property's August 3, 2017 sale is probative of its true or fair market value as of any of the valuation dates involved herein. "It is well settled that the selling price of real property involved in a judicial determination of its assessable value is a 'guiding indicium' of fair value and ordinarily is merely evidential, although under certain circumstances it might become controlling." Harrison Realty Corp. v. Harrison Town, 16 N.J. Tax 375, 381 (Tax 1997), aff'd per curiam, 17 N.J. Tax 174 (App. Div. 1997) (citing Glen Wall Assocs. v. Wall Twp., 99 N.J. 265 (1985); Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157 (1949); Rek Investment v. Newark, 80 N.J. Super. 552 (App. Div.






1963); Coastal Eagle Point Oil Co. v. West Deptford Twp., 13 N.J. Tax 242 (Tax 1993), aff'd o.b.

per curiam, 15 N.J. Tax 190 (App. Div. 1995)). For a property sale to be a trustworthy and reliable

indicator of true or fair market value, the following criteria must be satisfied: "buyer and seller

are typically motivated, and neither is under duress; . . . buyer and seller are well informed or well

advised and are acting prudently, knowledgeably and in their respective self-interests; . . . the

property has been reasonably exposed to an open, relevant and competitive market for a reasonable

period of time; . . . the purchase price is paid in cash or its equivalent; and . . . the purchase price

is unaffected by special or creative financing or by other special factors, agreements, or

considerations." See Venture 17, LLC v. Borough of Hasbrouck Heights, 27 N.J. Tax 108, 126

(Tax 2013) (citing Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 94 (Tax

1996)).

Here, Slim & Thin failed to prove that the subject property's August 3, 2017 sale was a

credible and reliable indicator of true or fair market value. Rather, the record discloses that the

seller was likely under duress, as the sale was materially impacted by a potential foreclosure action

and liens on the subject property. During trial, credible evidence was elicited that to keep the

former restaurant business afloat, the seller incurred substantial debt secured by liens against the

subject property. Apparently, three liens encumbered the subject property, and the lienholder in

the first mortgage position had temporarily agreed to forebear institution of foreclosure

proceedings. According to Slim & Thin's expert, "the main lienholder was paid back" from the






proceeds of the sale; however, he was unaware whether any sums were paid to the junior lienholders.[5]

Additionally, the Seller's Residency Certification/Exemption, form GIT/REP-3, accompanying the Deed, reflects that "[t]he real property being sold is subject to a short sale instituted by the mortgagee, whereby the seller agreed not to receive any proceeds from the sale and the mortgagee will receive all proceeds paying off an agreed amount of the mortgage." According to West Caldwell's expert, a forbearance agreement was recorded on or about February 17, 2011, in the Essex County Register's Office whereby the lienholder in the first mortgage position agreed not to foreclose on its mortgage provided that the borrower remitted certain monthly amounts to the lienholder. Thus, it appears that the seller's mortgagee, and not the seller, played a material role in fixing the sale price for the subject property.

For the above-stated reasons, the court finds that the subject property's August 3, 2017 sale is not probative of its true or fair market value as of any valuation date involved herein.

Next, the court's analysis centers on the testimony and evidence elicited from Slim & Thin's expert. The court highlights that page 1 of Slim & Thin's expert's report states, "[t]he property was purchased on August 3, 2017 for consideration of $1,000,000. Conversations with the property owner revealed that at the time of sale, the subject property was not listed on the open market. The current property owner reached out [sic] the former owner and made an offer for the property." However, these statements were wholly contradictory to the trial testimony offered by Slim & Thin's expert. During trial, Slim & Thin's expert stated that the subject property was

---

[5] Slim & Thin's expert stated that based on his discussions with counsel for the lienholder in the first mortgage position, the mortgage was for $1,700,000, and approximately $900,000 remained owing when the subject property was sold.






"actively listed" for sale on a multiple listing service "essentially from 2008 to 2017." Moreover, Slim & Thin's expert further opined during trial that, "this property was very adequately put on the market, it was on the market for a period of years, while it was a short sale, the main lienholder was paid back, so it certainly has some indication of market value, in my opinion."

Additionally, in direct response to Slim & Thin's counsel's direct examination question that, "as part of the process of preparing this [appraisal] report did you do any due diligence into the circumstances surrounding that purchase," the expert replied, "I did a lot of due diligence" (emphasis added). However, effective cross-examination revealed that the alleged "due diligence" and Slim & Thin's expert's discovery that the subject property was "actively listed" for sale on a multiple listing service and was a short sale transaction was not undertaken by Slim & Thin's expert in preparing his appraisal report, but rather was undertaken after the report was finished and only in his preparation for trial in these matters.

Cross-examination further revealed that Slim & Thin's expert did not review, nor have in his possession, copies of the lease agreements for any of the five comparable leased properties that he relied on. Rather, in preparing his appraisal report, Slim & Thin's expert relied on data and information reported by CoStar, a commercial real estate information website. Only after his appraisal report was prepared and in preparation of trial did Slim & Thin's expert attempt to engage in telephone discussions with representatives and/or brokers involved in the lease transactions.

However, the court questions the depth and breadth of Slim & Thin's expert's telephone discussions with those representatives and/or brokers. Specifically, with respect to comparable lease 1, although CoStar identified the "starting rent" as $26.00 per square foot, Slim & Thin's






expert did not know whether any rent concessions or periods of free rent was afforded to the tenant under the lease. Additionally, Slim & Thin's expert did not know whether the lease contained any rent increases and if so, when the rent increases were triggered, and how much those increases were.

Sound property appraisal practice recognizes that "value is created by the anticipation of future benefits . . . The value of income-producing real estate is based on the income it will produce in the future . . . Failure to consider future income contradicts the principle of anticipation, *i.e.,* the present worth of future benefits . . . The ultimate concern is the future, and while current income is a good starting point, the direction and expected rate of income change are critical to the capitalization of income as a valuation approach." First Republic Corp. of America v. East Newark Borough, 16 N.J. Tax 568, 578 (Tax 1997) (citing Appraisal Institute, The Appraisal of Real Estate, 35 (11th ed. 1996)). Thus, when a lease contains a rent escalation provision "those increases in income, to the extent they reflect economic rent, should be reflected in the appraiser's estimate of the property's future income." Ibid. The logic and rationale behind this principle is straightforward; the landlord is often willing to accept a lower rent at the outset of a lease to recognize the expenses that the tenant will bear in establishing or relocating its business. Thus, the landlord will permit the tenant to amortize those start-up costs during the initial months or first year of the lease when the rent is lower.

Similarly, with respect to comparable lease 2, although CoStar identified the "starting rent" and "effective rent" as $30.58 per square foot, Slim & Thin's expert did not know whether any concessions or period of free rent was provided to the tenant under the lease. Additionally, Slim & Thin's expert did not know whether the lease contained rent escalation provisions, and if so, what the rent increases were. Importantly, Slim & Thin's expert did not verify comparable






lease 2's terms with any person having personal knowledge. Rather, Slim & Thin's expert exclusively relied on data reported by CoStar.

CoStar identified the "starting rent" for comparable lease 3 as $19.00 per square foot, with an annual 2% rent escalation over the five-year lease term. However, the CoStar listing further recited that the "effective rent" was $16.52 per square foot. Cross-examination disclosed that Slim & Thin's expert utilized the reported "effective rent" as comparable lease 3's market rent, yet he did not know how that "effective rent" was calculated. According to Slim & Thin's expert, the tenant received a rent reduction for capital improvements; however, Slim & Thin's expert did not know what capital improvements were undertaken or the exact costs for those improvements. Rather, cross-examination revealed that during discussions between Slim & Thin's expert and the listing broker, "I asked him to confirm what he input [into CoStar], and what he input was $19.00 as a starting rent . . . and he confirmed that." However, the listing broker did not or was unable to confirm or explain to Slim & Thin's expert how he arrived at the $16.52 "effective rent." Thus, Slim & Thin's expert's verification process amounted to little more than a confirmation of who was the individual responsible for data entry, and not an investigation of whether the reported lease data was credible and reliable.

CoStar identified the "starting rent" for comparable lease 4 as $22.00 per square foot. However, Slim & Thin's expert did not know whether any period of free rent was afforded to the tenant under the lease. Additionally, Slim & Thin's expert did not know whether the lease contained a rent escalation provision, and if so, what the rent increases were. Importantly, CoStar did not identify the lease term for comparable lease 4, and Slim & Thin's expert did not know or was unable to ascertain the same. According to Slim & Thin's expert, in discussions with the listing broker, "he could only confirm that the information provided to CoStar was correct," but






would not disclose any additional information. Moreover, Slim & Thin's expert acknowledged that comparable lease 4 is in a "Power Center . . . [a] center anchored by a major tenant," approximately forty-six miles from the subject property.

Finally, with respect to comparable lease 6, CoStar identified the "asking rent" as $45.00 per square foot and the "starting rent" as $24.00 per square foot. However, Slim & Thin's expert could not explain why there was a $21.00 disparity between the "asking rent" and the "starting rent." Moreover, comparable lease 6 is approximately one thousand square feet, or twenty-five percent the size of the subject property; is approximately 22 miles from the subject property in Fort Lee, Bergen County; and is not a free-standing restaurant like the subject property. In addition, the court's review of the CoStar listing for comparable lease 6 discloses that a "concession[] and buildout" was afforded for "restaurants & cafes" of 46.67%. Thus, the court questions whether a rent concession was provided to the tenant and the 46.67% discount applied to the $45.00 market rent ($45.00 x 46.67% = $21.00), accounts for the tenant's anticipated buildout costs in converting the leased area into a restaurant or café.

Although commercial real estate information websites like CoStar may be a valuable resource and starting point for the identification of potential comparable properties in the marketplace, it is the process by which an appraiser verifies the accuracy of that data and information that is the hallmark of an effective appraisal report and sound opinion of value. See VBV Realty, LLC v. Scotch Plains Twp., 29 N.J. Tax 548, 563 (Tax 2017). As concisely and eloquently expressed by Judge Crabtree, "[t]he probative quality of an expert's opinion depends not only upon the facts offered in support of that opinion, but also upon the persuasive character of the expert's analysis." Harrison Realty Corp. v. Harrison Town, 16 N.J. Tax 375, 383 (Tax 1997), aff'd per curiam, 17 N.J. Tax 174 (App. Div. 1997). Here, effective cross-examination of

   

Slim & Thin's expert disclosed several material missteps in his investigation and data verification processes, resulting in his conclusions and opinions being of dubious value to the court.

When data and information are not properly sourced or verified, the opinions of value derived therefrom are not credible evidence of economic or market rent. Here, due to Slim & Thin's expert lack of knowledge of material lease terms, how effective rent was calculated, whether the comparable leases contained rent escalation provisions, what rent concessions were afforded to the tenant, and the failure to verify lease terms with individuals possessing first-hand knowledge, the court is unable to accord Slim & Thin's expert's market or economic rent conclusions any weight.

Conversely, West Caldwell's expert possessed and reviewed copies of his comparable leases 1, 2, 3, and 4. With respect to his comparable lease 5, West Caldwell's expert possessed a summary or lease abstract, but he stated that it was "verified . . . by my brother Jeff in connection with the sale of the property."[6] Additionally, West Caldwell's expert offered credible testimony that in addition to reviewing the actual lease agreements, he verified the lease terms with either the attorney for the landlord or tenant for comparable leases 1, 2, 3, and 4. Moreover, he prepared preliminary appraised reports in connection with local property tax appeals for comparable leases 1, 2, 3, and 4.

West Caldwell's expert's comparable lease 1 is a 5,874 square foot stand-alone restaurant in Fairfield, Essex County, having a May 2011 lease date and rent of $20.43 per square foot. In West Caldwell's expert's opinion, comparable lease 1 is "highly comparable" to the subject property as they are the "same genre" building. Moreover, "in terms of location. . . it is highly

---

[6] West Caldwell's expert's brother is a New Jersey state certified general real estate appraiser in their office.





comparable" to the subject property, located on the same road in the neighboring municipality. According to West Caldwell's expert, comparable lease 1 "had been renovated sometime in . . . 2011, was a "slightly larger facility" than the subject property and has "shared parking with an office building adjoining, and parking is a little more constrained," so he applied a +20% adjustment. However, effective cross-examination disclosed that West Caldwell's expert's +20% adjustment was based purely on "[m]y interpretation of the market." West Caldwell's expert provided no other support or analysis for this sizeable adjustment.

Comparable lease 2 is a 3,398 square foot stand-alone restaurant in Fairfield, Essex County, having a December 2011 lease date and rent of $29.75 per square foot. Comparable lease 2 is also close to the subject property in the adjacent municipality. West Caldwell's expert applied no adjustments to comparable lease 2.

Comparable lease 3 is a 4,440 square foot stand-alone restaurant in Morristown, Morris County, having a September 2019 lease date and rent of $34.15 per square foot. Comparable lease 3 is located adjacent to Morristown's downtown area, along South Street. However, comparable lease 3 was a modified gross lease, so West Caldwell's expert deducted $4.81 from the lease rent to account for the estimated real estate tax expense in determining a market rent of $29.34. In addition, West Caldwell's expert applied a +15% adjustment to comparable lease 3. However, effective cross-examination disclosed that the +15% adjustment was entirely subjective and based on "the condition of the property and the fact that it had . . . no on-site parking." West Caldwell's expert offered no further data or support for how the +15% adjustment was arrived at.

Comparable lease 4 is an 1,820 square foot restaurant in a strip shopping center in Roseland, Essex County, having a September 2015 lease date and rent of $23.81 per square foot.






Despite being approximately 40% the size of the subject property, West Caldwell's expert applied no adjustments to comparable lease 4.

Comparable lease 5 is a 4,900 square foot stand-alone restaurant in Palisades Park, Bergen County, having a January 2018 lease date and rent of $33.69 per square foot. However, during cross-examination, as justification for his -10% adjustment, West Caldwell's expert replied, that "this is a newer building, I do note that part of the square footage is in the basement. . . Basically it's my interpretation of what a brand-new building would rent for in comparison to one that was just renovated . . . so I made a downward 10% adjustment." West Caldwell's expert offered no further data or support for how the -10% adjustment was arrived at.

It is well-settled that the weight to be accorded expert testimony "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation." Inmar Associates, Inc., 2 N.J. Tax at 66 (citing City of Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959)). Thus, for the opinions of an expert to be of any import, the expert is required to "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992). Without an adequate explanation of the basis, "the opinion of the expert is entitled to little weight. . . ." Dworman v. Tinton Falls Bor., 1 N.J. Tax 445, 458 (Tax 1980). Additionally, "this court has not only the right, but the duty, to apply its own judgment to valuation data submitted to it by experts in order to arrive at a true value and fix an assessment for the tax years in question." Lamm Associates v. Borough of West Caldwell, 1 N.J. Tax 373, 387-388 (Tax 1980) (citing Samuel Hird and Sons, Inc., 87 N.J. Super. 65).






Here, the court finds that comparable lease 3's location in Morris County, and being adjacent to Morristown's downtown area, is not representative of the subject property's competitive market area. Moreover, the court finds that comparable lease 5's location in Bergen County, approximately twenty miles from the subject property, is also not representative of the subject property's competitive market area. The court finds West Caldwell's expert's comparable lease 1, comparable lease 2, and comparable lease 3 locations within Essex County to be competitive and comparable with the subject property. However, the court finds that West Caldwell's expert's adjustments to comparable leases 1 and 3 were entirely subjective and not supported by any market-derived evidence or analysis. Accordingly, the court rejects West Caldwell's expert's condition adjustments to comparable leases 1 and 3 as not credible. Accepting West Caldwell's expert's comparable lease 1, comparable lease 2, and comparable lease 3 as evidence of economic or market rent, discloses rents of $20.43, $23.81, and $29.75 per square foot. After analyzing the foregoing comparable leases, the court attributes the greatest weight to West Caldwell expert's comparable lease 1 ($20.43 p.s.f.) and comparable lease 2 ($29.75 p.s.f.), as those properties are closest in location, are stand-alone restaurants, and possess gross leasable areas like the subject property. Accordingly, the court concludes an economic or market rent of $25.50 per square foot for the subject property, as of the October 1, 2017, October 1, 2018, and October 1, 2019 valuation dates.

### B. Vacancy and collection loss

In reaching his concluded vacancy and collection loss factor to be applied to the subject property, Slim & Thin's expert examined published data from PWC/Korpacz of National Strip Shopping Centers as of the 3rd Quarter 2017, 3rd Quarter 2018, and 3rd Quarter 2019. After reviewing that data, Slim & Thin's expert opined a stabilized vacancy and collection loss factor of






5% should be applied to the subject property for the 2018, 2019, and 2020 tax years.

Similarly, West Caldwell's expert reviewed published data from PWC/Korpacz of National Strip Shopping Centers as of the 3rd Quarter 2017, 3rd Quarter 2018, and 3rd Quarter 2019. In addition, he reviewed Avison Young Real Estate Advisory Group vacancy reports, Colliers International market reports, and Marcus & Millichap market reports. After reviewing that data, West Caldwell's expert similarly opined a stabilized vacancy and collection loss factor of 5% should be applied to the subject property for the 2018, 2019, and 2020 tax years.

The court finds the experts' concluded 5% vacancy and collection loss factors are reasonable and supported by the market and survey data. Accordingly, the court will apply a 5% vacancy and collection loss factor to the subject property's potential gross income as of the October 1, 2017, October 1, 2018, and October 1, 2019, valuation dates.

### C. Stabilization

Stabilization "involves elimination of abnormalities or any additional transitory conditions from stated income or expenses to reflect conditions that are expected to continue over the economic life of the property." First Republic Corp. of America, 16 N.J. Tax at 579 (Tax 1997) (citing The Dictionary of Real Estate Appraisal, 344-45 (3rd ed. 1993)). Consistent with that principle, under the income capitalization approach, an appraiser must perform a "comprehensive analysis of the annual expenses" and income of the property being appraised. The Appraisal of Real Estate, at 453. As part of that analysis an appraiser prepares a reconstructed operating statement to "reflect the potential future performance of a property, considering the historical income and expenses of an investment property." Ibid. Through an examination and analysis of a property's historical income and expense data, when measured against comparable properties in






the market, an appraiser can discern the potential future performance of the property over its economic life.

1.    Operating expenses and reserves

The experts' stabilized operating expense percentages for management fees, real estate commissions, and structural reserves/repairs were very similar.  However, the manner that the experts calculated and applied those stabilized operating expenses on the subject property's reconstructed operating statements were very different.

In Slim & Thin's expert's opinion, a management fee expense of 5%, a leasing commission expense of 5%, and a structural reserve expense of 2% should be applied to the subject property's potential gross income.  Thus, in preparing his reconstructed operating statement, Slim & Thin's expert computed the stabilized operating expenses as a percentage of potential gross income instead of as a percentage of effective gross income.  According to Slim & Thin's expert, because comparable leases are net leases and not gross leases, he opined that stabilized operating expenses should be calculated as a percentage of potential gross income.  He further offered that if the comparable leases were gross leases, he would have computed the stabilized operating expenses as a percentage of effective gross income.

Conversely, in West Caldwell's expert's opinion, a management fee expense of 5%, a leasing commission expense of 5%, a structural repair expense of 1%, and a structural reserve expense of 1% should be applied to the subject property's effective gross income.  In sum, West Caldwell's expert computed and applied his stabilized operating expenses against the subject property's reconstructed effective gross income.

"The standard method for calculating value based on the income method is to calculate






effective gross income by subtracting a vacancy and rent loss allowance" from potential gross income. Harclay House v. East Orange City, 18 N.J. Tax 564, 569 (Tax 2000) (citing Appraisal Institute, The Appraisal of Real Estate, 482-90 (11th ed. 1996)). A vacancy and collection loss "allowance is usually estimated as a percentage of potential gross income, which varies depending on the type of property and characteristics of the physical property." Pine Plaza Associates, L.L.C. v. Hanover Twp., 16 N.J. Tax 194, 206 (Tax 1996) (citing The Appraisal of Real Estate, at 489). A vacancy and credit loss factor is deducted from potential gross income "because economic conditions, not necessarily actual conditions, are being valued." Lawrence Assocs. v. Lawrence Twp., 5 N.J. Tax 481, 562 (Tax 1983).

Thus, effective gross income "is the anticipated income from all operations of the real property, adjusted for vacancy and collection losses." Harclay House, 18 N.J. Tax at 567, n.1. Under the direct capitalization method,

> an appraiser works down from potential gross income to net operating income. To do this, the appraiser will . . . estimate the potential gross income of the property by adding the rental income and other potential income . . . estimate the vacancy and collection loss . . . subtract vacancy and collection loss from total potential gross income to arrive at the effective gross income of the subject property. . . .
>
> [The Appraisal of Real Estate, at 460.]

"The next step in the income approach analysis is a determination of operating expenses to be deducted from effective gross income . . . Because the [property] is being valued on a net lease basis, the categories of expenses payable by the landlord are limited." Pine Plaza Associates, L.L.C., 16 N.J. Tax at 206. "Expenses . . . can be expressed in the same units of comparison used for income, or they can be expressed as a percentage of the effective gross income." The Appraisal of Real Estate, at 468 (emphasis added). However, because certain operating expenses like






management, utilities, maintenance, structural repairs, administrative, leasing commissions are variable, i.e., they fluctuate "with the level of occupancy or the extent of services provided," it would be inappropriate to express them as a percentage of potential gross income. Id. at 481. Accordingly, the court finds West Caldwell's expert's approach, computing the stabilized operating expenses as a percentage of effective gross income to be more appropriate and accurate. The court finds a management fee expense of 5%, a leasing commission expense of 5%, a structural repair expense of 1%, and a structural reserve expense of 1% of the subject property's effective gross income to be reasonable and supported by the evidence.

    2.    Capitalization

The direct capitalization technique is used "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491; Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's Net Operating Income into an estimate of value.

Here, in deriving their capitalization rates, Slim & Thin's expert and West Caldwell's expert undertook a review of data, including investor surveys and published capitalization rates, relying primarily on the Band of Investment technique.[7] The Band of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a

---

[7] "[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Hull Junction Holding Corp., 16 N.J. Tax at 82-83. "Relevant data is also collected and published by . . . Korpacz [PWC] Real Estate Investor Survey." Id. at 83. By scrutinizing and "analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.






value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding Corp., 16 N.J. Tax. at 80-81 (quoting Appraisal Institute, The Appraisal of Real Estate, 467 (10th ed 1992)).

Slim & Thin's expert examined PWC/Korpacz Real Estate Investor Surveys ("Korpacz"), American Council of Life Insurers ("ACLI") Investment Bulletins, and Real Estate Research Corporation ("RERC") reports to derive his mortgage interest rates, loan-to-value ratios, amortization terms, and equity dividend rates. Slim & Thin's expert concluded the following capitalization rates, as of each valuation date: (i) October 1, 2017, 7.10% (4.25% interest rate, 60% loan-to-value ratio, twenty-five-year amortization period, and 8.0% equity dividend rate); (ii) October 1, 2018, 7.20% (4.75% interest rate, 60% loan-to-value ratio, twenty-five-year amortization period, and 7.75% equity dividend rate); and (iii) October 1, 2019, 7.20% (4.25% interest rate, 60% loan-to-value ratio, twenty-five-year amortization period, and 8.25% equity dividend rate).

West Caldwell's expert also examined the Korpacz, ACLI, and RERC data. In addition, West Caldwell's expert conferred with a local banking institution and analyzed the Federal Reserve ten-year, twenty-year, and thirty-year treasury yields to derive his mortgage interest rates, loan-to-value ratios, amortization terms, and equity dividend rates. West Caldwell's expert concluded the following capitalization rates, as of each valuation date: (i) October 1, 2017, 6.80% (4.50% interest rate, 70% loan-to-value ratio, twenty-five-year amortization period, and 7.12% equity dividend rate); (ii) October 1, 2018, 6.97% (4.50% interest rate, 70% loan-to-value ratio, twenty-five-year amortization period, and 7.67% equity dividend rate); and (iii) October 1, 2019, 6.59% (5.50% interest rate, 70% loan-to-value ratio, twenty-five-year amortization period, and 6.39% equity dividend rate).






The court's own review and analysis of the above information discloses that: (i) as of the October 1, 2017 valuation date, retail property interest rates were 4.25% to 4.58%, loan-to-value ratios were 55% to 75%, amortization terms were eighteen to thirty years, and treasury yields and extracted equity dividend rates were 2.34% to 5.90%; (ii) as of the October 1, 2018 valuation date, retail property interest rates were 4.25% to 4.97%, loan-to-value ratios of were 54% to 75%, amortization terms were twenty to thirty years, and treasury yields and extracted equity dividend rates were 3.09% to 5.06%; and (iii) as of the October 1, 2019 valuation date, retail property interest rates were 4.23% to 5.50%, and loan-to-value ratios were 59% to 75%, amortization terms were twenty-one to thirty years, and treasury yields and extracted equity dividend rates were 1.65% to 5.89%.

Accordingly, based on a review of the above data and information, as well as the experts' testimony and opinions, the court concludes that under the Band of Investment technique: (i) as of the October 1, 2017 valuation date, a mortgage interest rate of 4.375% is reasonable, both experts' proposed twenty-five-year amortization term is reasonable, West Caldwell's expert's proposed 70% loan-to-value ratio is reasonable, and because the subject property is a stand-alone restaurant, not located in a strip center or neighborhood center, an equity dividend rate of 7.50%, is reasonable; and (ii) as of the October 1, 2018 valuation date, West Caldwell's expert's proposed mortgage interest rate of 4.50% is reasonable, both experts' proposed twenty-five-year amortization term is reasonable, West Caldwell's expert's proposed 70% loan-to-value ratio is reasonable, and because the subject property is a stand-alone restaurant, not located in a strip center or neighborhood center, an equity dividend rate of 7.70%, is reasonable; and (iii) as of the October 1, 2019 valuation date, a mortgage interest rate of 4.625% is reasonable, both experts' proposed






twenty-five-year amortization term is reasonable, West Caldwell's expert's proposed 70% loan-to-value ratio is reasonable, and an equity dividend rate of 7.50% is reasonable.

Thus, using the Band of Investment technique, the calculation of the capitalization rate as of the October 1, 2017, October 1, 2018, and October 1, 2019, valuation dates would be:

2018

| | | | | |
|---|---|---|---|---|
| Mortgage interest rate | 4.375% | | | |
| Amortization period | 25 years | | | |
| Mortgage constant | 6.585 | | | |
| Mortgage component | 70% | x | 6.585 = | 4.61 |
| Equity divided rate | 7.50% | | | |
| Equity component | 30% | x | 7.50% = | 2.25 |
| | | | | 6.86% |

2019

| | | | | |
|---|---|---|---|---|
| Mortgage interest rate | 4.50% | | | |
| Amortization period | 25 years | | | |
| Mortgage constant | 6.670 | | | |
| Mortgage component | 70% | x | 6.670 = | 4.67 |
| Equity divided rate | 7.70% | | | |
| Equity component | 30% | x | 7.70% = | 2.31 |
| | | | | 6.98% |

2020

| | | | | |
|---|---|---|---|---|
| Mortgage interest rate | 4.625% | | | |
| Amortization period | 25 years | | | |
| Mortgage constant | 6.755 | | | |
| Mortgage component | 70% | x | 6.755 = | 4.73 |
| Equity divided rate | 7.50% | | | |
| Equity component | 30% | x | 7.50% = | 2.25 |
| | | | | 6.98% |

Thus, the court concludes the following capitalization rates should apply to the subject property: (i) 6.86%, as of the October 1, 2017 valuation date; and (ii) 6.98%, as of the October 1, 2018 and October 1, 2019 valuation dates.

   

**2018, 2019 & 2020 Tax Years**

INCOME:

| | | | |
|---|---|---|---|
| Restaurant/Bar | $25.50 p.s.f. | @ 4,579 sq. ft. | $116,765 |
| TOTAL: | POTENTIAL GROSS INCOME | | $116,765 |

| | | |
|---|---|---|
| LESS: Vacancy & Collection Loss | @ 5.00% PGI | ($ 5,838) |
| TOTAL: | EFFECTIVE GROSS INCOME | $110,927 |

STABILIZED EXPENSES:

| | | |
|---|---|---|
| Leasing Commissions | @ 5% of EGI | $ 5,546 |
| Management | @ 5% of EGI | $ 5,546 |
| Structural Repairs | @ 1% of EGI | $ 1,109 |
| Replacement Reserves | @ 1% of EGI | $ 1,109 |
| TOTAL: EXPENSES | | ($13,310) |

NET OPERATING INCOME      $ 97,617

Applying the capitalization rates to the subject property's Net Operating Income, as of each valuation date, results in the following values: (i) $1,422,988, as of October 1, 2017 ($97,617/.0686 = $1,422,988); (ii) $1,398,524, as of October 1, 2018 ($97,617/.0698 = $1,398,524); and (iii) $1,398,524, as of October 1, 2019 ($97,617/.0698 = $1,398,524).

Accordingly, the court finds the true or fair market value of the subject property to be: (i) $1,423,000, as of the October 1, 2017 valuation date; (ii) $1,398,500, as of the October 1, 2018 valuation date; and (iii) $1,398,500, as of the October 1, 2019 valuation date.

### 2. Corrected Local Property Tax Assessment

Having reached a conclusion of the subject property's true or fair market value, the court will turn its attention to determining the correct assessment for the 2018, 2019, and 2020 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property






by applying the average ratio to the true value of the property. . . ."  N.J.S.A. 54:51A-6(a).  This process involves application of the Chapter 123 common level range.  N.J.S.A. 54:1-35a(b).

For the 2018 tax year, the ratio of assessed value, $1,385,700, to true market value, $1,423,000, yields a ratio of 97.38% ($1,385,700/$1,423,000 = 97.38%), which falls between West Caldwell's upper limit (100%) and lower limit (76.91%) of the Chapter 123 common level range. Consequently, no reduction to the subject property's 2018 tax year assessment is warranted.

For the 2019 tax year, the ratio of assessed value, $1,385,700, to true market value, $1,398,500, yields a ratio of 99.08% ($1,385,700/$1,398,500 = 99.08%), which falls between West Caldwell's upper limit (100%) and lower limit (76.15%) of the Chapter 123 common level range. Consequently, no reduction to the subject property's 2019 tax year assessment is warranted.

For the 2020 tax year, the ratio of assessed value, $1,385,700, to true market value, $1,398,500, yields a ratio of 99.08% ($1,385,700/$1,398,500 = 99.08%), which falls between West Caldwell's upper limit (100%) and lower limit (76.15%) of the Chapter 123 common level range. Consequently, no reduction to the subject property's 2020 tax year assessment is warranted.

Accordingly, judgments affirming the subject property's 2018, 2019, and 2020 local property tax assessments shall be entered.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.




